## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ALAN LYDELL WADE,

                Petitioner,

v.                                    No. _____

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

                Respondent.

_____/


## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254


Daniel S. Lawless
Abdel Reyes
Office of the Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301-1300
(850) 942-8818
daniel_lawless@fd.org

*Counsel for Petitioner*

## INTRODUCTION

Petitioner Alan Lydell Wade, a Florida prisoner, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner's state conviction and continued custody violate the United States Constitution. The Court should vacate his conviction and sentence under § 2254.

## RECORD REFERENCES

References to the Record on Appeal for Mr. Wade's direct appeal, which includes volumes one through eight of the state court record, are designated "R. [page]." References to the transcript of Mr. Wade's trial, which is contained in volumes nine through fifteen in the Record on Appeal are designated "T. [page]." References to the two volumes containing trial exhibits are designated "E. [page]." References to the supplemental Record on Appeal are designated "R Supp. [page]." References to the Record on Appeal for Mr. Wade's postconviction proceedings are designated "PCR. [page]." References to the resentencing transcript are designated "RS. [page]." References to the appendix to this petition are designated "A[page]."

## STATEMENT OF THE CASE

On October 24, 2007, Alan Lydell Wade was convicted of two counts each of the kidnapping, robbery, and first-degree murder of Carol and Reggie Sumner in the Fourth Judicial Circuit, in and for Duval County. R. 546-51; *see also State v. Wade*, 16-2005-CF-010263-BXXX (Duval Cty. Cir. Ct.). After the penalty phase, the jury recommended a sentence of death with respect to both counts of first-degree murder, R. 586-87, and the trial court imposed two death sentences against Mr. Wade, R. 799-

1

819. As to the other counts, Mr. Wade was concurrently sentenced to life for the kidnapping counts and 15 years for the robbery counts. R. 791-94.

Mr. Wade raised two claims on direct appeal relating to his convictions: (1) the prosecutor made statements during closing argument that constituted fundamental error, and (2) the trial court erred in denying the motion for mistrial regarding a golden rule violation by the prosecutor during closing argument. *Wade v. State*, 41 So. 3d 857, 867 (Fla. 2010).[1] The Florida Supreme Court affirmed Mr. Wade's convictions and sentences, but four Justices concurred noting their concern regarding improper statements made by the prosecutor during closing arguments in the penalty phase. *Id.* at 880-81 (Pariente, J., concurring). The United States Supreme Court denied certiorari. *Wade v. Florida*, 562 U.S. 1183 (2011).

On December 27, 2011, Mr. Wade filed a motion for postconviction relief under Fla. R. Crim. P. 3.851. PCR. 201-74. The motion was subsequently amended twice. PCR. 385-472, 494-578. After holding an evidentiary hearing, the circuit court denied relief. PCR. 941-80. On appeal, Mr. Wade raised the claim that trial counsel was ineffective during the guilt phase in which he raised several subclaims. *Wade v. State*, 156 So. 3d 1004, 1014 (Fla. 2014).[2] The Florida Supreme Court affirmed the denial of postconviction relief and Mr. Wade did not seek certiorari review.

---

[1]    Mr. Wade also raised several claims challenging his death sentences. *Id.*
[2]    Mr. Wade raised claims that trial counsel was ineffective during jury selection and the penalty phase, which both also included multiple subclaims. *Id.* at 1014-15.

2

On November 1, 2016, Mr. Wade moved for successive postconviction relief of his death sentences in light of *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016). After the motion was dismissed without prejudice pending the Florida Supreme Court's determination that *Hurst* applied retroactively, the circuit court granted Mr. Wade's renewed successive motion for postconviction relief, and his death sentences were vacated. After initially appealing the order, the State moved to voluntarily dismiss the appeal. *See* Order Granting Motion to Dismiss, *State v. Wade*, Case No. SC17-886 (Fla. May 25, 2017).[3]

Mr. Wade's resentencing hearing was held in June, 2022. The jury recommended sentences of life, and Mr. Wade was sentenced to life in prison without the possibility of parole on both counts on June 16, 2022. *See* Appendix A (Judgment and Sentence).

## STATEMENT OF FACTS[4]

### A. The case at trial

On July 10, 2005, the Jacksonville Sheriff's Office received a call from the daughter of Carol and Reggie Sumner that she had not heard from them in multiple days. T. 476. When family and neighbors checked the house the next day their car was missing, and the inside appeared ransacked. T. 477-78. The Sumners' daughter

---

[3]    Mr. Wade also filed a petition for writ of habeas corpus in the Florida Supreme Court under *Hurst* that was likewise voluntarily dismissed. *See* Order Granting Motion to Dismiss, *Wade v. Jones, etc.*, Case No. SC17-446 (Fla. June 1, 2017).

[4]    Because Mr. Wade is only challenging his convictions, facts relevant only to his now-vacated death sentences have been omitted.

informed law enforcement that her mother had recently sold a car to a woman named Tiffany Cole. T. 471. After a BOLO was sent out regarding the victims' Lincoln Town Car, an off-duty JSO officer called in that he had seen the car parked near his home in a wooded area in Sanderson, Florida. T. 492. The car was found later that day with duct tape and shovels in the trunk. T. 530-31.

JSO detectives found unusual activity in the victims' bank accounts, including recent high dollar withdrawals that totaled around $5,000. T. 524-25, 529. Detectives were able to track the ATM withdrawals to Charleston, South Carolina and security camera footage showed a young white male in his twenties using the ATMs, who was later identified as Michael Jackson, and a silver Mazda RX-8 in the background. T. 525-28, 624. Later that day, detectives received calls from a male and female pretending to be Carol and Reggie Sumner. T. 531. The callers were later identified as Jackson and Cole. T. 554. Detectives discovered that the phone number they called from was registered to David Jackson, Jackson's brother, and that the Mazda seen in the ATM footage had been rented by Cole. T. 556-57.

Local law enforcement in Charleston spoke to Cole's brother, who told them she was staying at a Best Western Hotel with Jackson. T. 625. On July 14, 2005, law enforcement arrested Jackson and Cole in room 312 of the Best Western and Mr. Wade in room 302, both of which had been rented by Cole. T. 627-29. Law enforcement conducted searches of both rooms. In Jackson's and Cole's hotel room, detectives found several pieces of paperwork belonging to the victims, including back statements, a checkbook, and an uncashed check made out to Alan Wade. Jackson

4

was arrested with the victims' ATM card in his pocket. T. 632-38. Detectives found antique coins belonging to the victims in Cole's car, which had been in the parking lot of the Best Western. T. 634-35. The only item found in Mr. Wade's room belonging to the victims was a US Air Force key ring with Lincoln car keys. T. 631. The Mazda was eventually recovered near the rental agency. T. 639.

Bruce Nixon was arrested in Macclenny, Florida. After initially denying any role in the crime, Nixon agreed to take law enforcement to the scene where the victims were found buried. T. 921. The medical examiner testified that the cause of death for both victims was asphyxiation. T. 971-72.

Nixon testified on behalf of the State against Mr. Wade, Jackson, and Cole in exchange for a deal in which he pleaded guilty to second degree murder and ultimately received a term-of-years sentence. T. 923-24.[5] Nixon testified that he agreed to rob the victims in this case when Mr. Wade asked him to a few weeks before the crime occurred. T. 883-84. At that point there was no plan to commit a murder. T. 884. One night the four of them got together to dig a hole. T. 885. Nixon got shovels for the group and picked the spot: an isolated field in the woods in Georgia just down the road from a house in which Nixon used to live. T. 886-87. The group drove out there in the Mazda RX-8. T. 886. Cole held a light while the other three dug. T. 888.

---

[5]    Although Mr. Wade's jury was told that Nixon could be sentenced to life and that there was a good chance he would be, T. 924-25, Nixon was given a 45 year sentence, the minimum guideline sentence he could receive, based on his cooperation, R Supp. 52.

Nixon testified that Mr. Wade got permission from Jackson for Nixon to take part in the robbery. T. 890-91. Jackson was in control of the whole thing, including holding the victims' keys when no one was driving their car. T. 938-39. Nixon testified that when the group discussed committing the robbery, Jackson stated he was going to kill the victims with a medical injection. T. 892. Cole knew the victims and knew that they had recently sold their house in South Carolina. That was the motive behind the robbery. T. 894-95.

According to Nixon, the robbery itself involved Mr. Wade and Nixon asking the victims if they could use their phone. T. 897. Once inside the house, Nixon pulled out a realistic looking toy gun and duct taped the victims. T. 899-901. Jackson and Cole stayed outside in the Mazda because the victims would be able to recognize them. T. 898. Jackson entered the house and looked around for bank statements and credit cards. T. 902. Jackson then told Mr. Wade and Nixon to put the victims in the trunk of their Lincoln Town Car. T. 903.

Nixon testified that the four returned to the hole. Wade and Nixon drove in the Lincoln while Jackson and Cole took the Mazda. T. 904. When they got to the hole, Jackson popped the trunk and the duct tape had fallen off the victims. T. 907. Jackson was upset because the victims had now seen his face. T. 908. Nixon testified that he and Cole stood by the road while Mr. Wade and Jackson buried the victims in the hole. T. 910-12. The four drove to Sanderson to ditch the Lincoln. T. 913. Later that night they used an ATM, went to a Walmart, and returned to the hotel they had been staying in to go through the property they had taken from the victims' house. T. 915.

Nixon testified that Jackson also had a notepad with the victims' bank pin numbers. Mr. Wade and Cole also went back to the victims' house to take items, including a computer, that were later pawned off. Nixon testified he left the group a day later and did not go to South Carolina with them. T. 916.

The State presented minimal evidence tying Mr. Wade to the crime or corroborating Nixon's testimony. Law enforcement recovered no relevant physical or forensic evidence from the victims' home or car. Law enforcement did find Mr. Wade's fingerprint on a magazine addressed to the victims found in a common area of the Mazda. T. 749. Additionally, law enforcement recovered security camera footage of Mr. Wade walking into a Walmart five minutes after Jackson and Cole the day before the crime and walking into a Walmart with Cole the day after the crime. T. 828-30. The Walmart trips were connected to receipts for the purchase of gloves and a cleaning product. T. 828. Law enforcement also recovered footage of Jackson, Cole, and Mr. Wade at a gas station in Georgia a few days later attempting to use an ATM. T. 833.

Without objection, the State was able to build its case through hearsay, bad character evidence, and improper expert and opinion testimony. Mr. Wade's mother was called as a witness by the State for the dual improper purposes of providing bad character evidence about her son and to be impeached over the fact that she could not recall a statement in which Mr. Wade told her that Jackson promised him $40,000 for committing this crime. Additionally, several law enforcement officers, particularly Detective Meacham, the lead investigator, were allowed to walk the jury through all

7

facets of the investigation through constant hearsay and improper opinion and expert testimony. And, although trial counsel adopted co-defendant Jackson's motion to suppress the evidence found in hotel room 312, in which Jackson and Cole were arrested, trial counsel did nothing to suppress or object to the evidence found in hotel room 302.

Trial counsel's defense was to attack the lack of evidence tying Mr. Wade to anything other than the aftermath of the crime and to argue that he was an accessory after the fact. Trial counsel homed in on the lack of direct evidence tying him to the crime outside of Nixon's testimony. T. 1069. In particular, trial counsel noted that the only physical evidence tying Mr. Wade to the conspiracy included his fingerprint on the magazine found in the rented Mazda, the victims' car keys being in his hotel room, and the uncashed check that was made out to him. T. 1070-92. While trial counsel conceded that these items tied Mr. Wade into the attempts to get money from the victims' bank accounts and would have made him an accessory, there was no direct evidence putting Mr. Wade in their home or at the burial site, except for Nixon's testimony, who received a term-of-years sentence for his testimony against Mr. Wade. Trial counsel also attempted to impeach the investigation of the case generally, including the lack of forensic testing and the lack of any evidence tying the items purchased before the crime to the crime itself. T. 1073, 1086-87.

Additionally, trial counsel impeached Nixon with prior inconsistent statements and his reputation for untruthfulness. Elick Griffis,[6] a high school friend of Nixon's, testified regarding a keg party Nixon attended the day after the crime. T. 997. Nixon was handing out pain pills and showing off about $200 in cash, both of which he had admitted to having taken from the victims. T. 1000, 1005. Nixon told Griffis that he was "going get a lot of money" and "like a Mercedes Benz." T. 999. Nixon bragged that he "buried somebody alive" and that "he killed someone." T. 1000-01. Through Nixon's former girlfriend, the defense presented his reputation for untruthfulness and that several times he denied being involved in the crime at all. T. 1019-20.

After deliberating for about an hour, the jury found Mr. Wade guilty of all six counts. T. 1146.

At the conclusion of the penalty phase but before the *Spencer* hearing,[7] Mr. Wade attempted to bring the inadequate representation he received to the attention of the trial court:

| | |
|---|---|
| WADE: | Your Honor, may I say something? |
| COURT: | Sure. |
| WADE: | I would just like to state for the record that over the last two and a half years before my trial that my court appointed defense attorney, Refik Eler, has only been to see me for about an hour including jail visits and conversations before court. |
| COURT: | Get him out of here. Take him back. |

R. 1146.

---

[6]    The trial transcript erroneously refers to him as 'Alec Griffis.'

[7]    *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

9

### B.  Relevant testimony from the postconviction evidentiary hearing

Attorney Refik Eler represented Mr. Wade during the guilt phase in this case. PCR. 1625. Eler testified that this was a "very difficult" guilt phase case given that the State had "flipped" a codefendant to testify against Mr. Wade and given the circumstantial evidence in the case, particularly the victims' car keys found in Mr. Wade's hotel room. PCR. 1628-29. Given the amount of evidence the State was able to present in the guilt phase, "this was a penalty phase case." PCR. 1632. After initially denying any involvement, Mr. Wade confessed his involvement in the crime before trial to his defense team. PCR. 1630. The defense strategy at trial was to show to the jury that although Mr. Wade had some level of involvement, he was an accessory after the fact rather than a principal or co-conspirator. PCR. 1632.

Regarding not filing a motion to suppress the evidence found during the search of Mr. Wade's hotel room, Eler testified that he did not "feel as though I had a good faith basis to file a written motion to suppress" because he was "not sure [he] had standing" given that both rooms had been rented by Cole. PCR. 1635. However, Eler adopted the motion to suppress filed by Jackson's trial counsel related to the search of the room that Jackson and Cole had stayed in. PCR 1635, 1637. And despite calling this a "very difficult" case because of the car keys, Eler also testified that there was a strategic justification in that the car keys and other evidence found in the hotel room were not "that damning." PCR. 1636. Eler did not object to anything in this case in order to "stay credible with the jury," even though he conceded that he could have moved before trial to prevent the evidence from coming in. PCR. 1689. Regarding the

State calling Mr. Wade's mother for the purpose of impeaching her with a statement she denied making that he had hold her that Jackson was going to pay him $40,000 to commit this crime, Eler admitted that he had not conducted any research into the relevant case law holding that kind of impeachment inadmissible. PCR. 1693-94.

Eler testified that he did not object to any evidence presented by the State during the guilt phase even if he would have had a basis to keep the evidence out because of how a juror would perceive "out of all these objections" and that he wanted the State to present evidence about Jackson and Cole so the jury could hear "how much they were involved and how little Alan Wade was involved." PCR. 1638. In fact, Eler only objected twice the entire trial. PCR. 1711. As to the State having Mr. Wade's mother testify for the purposes of presenting prior bad acts of Mr. Wade and to impeach her, Eler did not object because it enabled them to get out mitigating evidence. PCR. 1639.

As to the attorney-client relationship, Eler blamed Mr. Wade for not being "forthcoming." PCR. 1641. Eler described their relationship as "strained" but not "antagonistic." PCR. 1720. "Once or twice" Eler went to the jail and Mr. Wade refused to meet. PCR. 1641, 1655. Eler testified that he had six legal visits at the jail with Mr. Wade during the two years he represented him. PCR. 1643. On cross, Eler walked through his legal visits with Mr. Wade, which showed that Eler did not visit with Mr. Wade until November 2005, which was three months after he was appointed and then waited thirteen months to make his second legal visit in December 2006. PCR. 1652-53. His third and fourth legal visits occurred on March 5 and 7, 2007. PCR. 1654. After a sixth month hiatus, Eler had a legal visit in September 2007. *Id.* The final

11

legal visit occurred in October 2007, on the eve of trial. PCR. 1655. Instead, Eler

claimed that he would talk to Mr. Wade at pretrial conferences about what was going

on in his case and the guilt phase investigator, Michael Hurst, would conduct the visits

with Mr. Wade at the jail. PCR. 1643.[8] Eler testified that he never went over the entire

trial file or discovery with Mr. Wade, even after Mr. Wade said he wanted to review

the file before deciding whether to plead or go to trial. PCR. 1716, 1718.

Eler testified regarding two different plea negotiations that occurred in this case.

First, there was an informal plea offer that involved a proffer of Mr. Wade's potential

testimony against the other co-defendants in exchange for pleading to second-degree

murder. PCR. 1646. Second, in October 2007, Eler discussed presenting a plea offer

to the State in which Mr. Wade would plead guilty to first-degree murder in exchange

for a sentence of life without parole. PCR. 1646-47.[9] Eler could not recall what efforts

he made to convince Mr. Wade to take the plea deal to second-degree murder. PCR.

1660.[10] Nor could Eler recall how much time he spent with Mr. Wade discussing the

plea offer. *Id.* There was a meeting regarding the plea deal in the office of Alan

Mizrahi, the assistant state attorney who prosecuted the case, on February 12, 2007.

---

[8]     Eler conceded that communicating with a client essentially exclusively in the courtroom before or after pretrial hearings is not ideal because you can only speak for a limited amount of time in a non-private space and there are other defendants, clients, and attorneys around. PCR. 1739.

[9]     On cross, Eler testified that the second plea offer he would have presented might have been for less than first-degree murder and a term of years, rather than life. PCR. 1666.

[10]     Eler testified that he "knew" he talked to Mr. Wade about the offer because he "documented it with acknowledgement." PCR. 1660. But the documentation Eler referred to was an acknowledgement of the second potential plea offer on the eve of trial. PCR. 637.

PCR. 642. Eler recalled that the attorney representing Nixon utilized Mr. Wade's mother to convince Nixon to take the plea offer. PCR. 1662-63. Eler, on the other hand, did not contemplate using any family or friends to speak with Mr. Wade about pleading. PCR. 1662.

Attorney Frank Tassone handled the penalty phase. PCR. 1090. Although there were "conversations and discussions" between Tassone and Eler about what the other was doing, they were each in charge of their half of the trial and Eler was the lead on the plea negotiations. PCR. 1090, 1119. Tassone confirmed that there was a "real discussion" between the State and the defense regarding the plea offer. PCR. 1118.

Tassone was also asked about the failure to take certain actions before trial and during the guilt phase. Although he could not recall any specific discussions about whether to move to suppress evidence or what reason Eler had for not doing so, Tassone recalled that he was "troubled" with the searches that had taken place after Mr. Wade's arrest. PCR. 1139-40. If Tassone had been in charge of the guilt phase defense, he would have filed a motion to suppress the evidence found in Mr. Wade's hotel room. PCR. 1141. Tassone disagreed with Eler and believed that "certainly" the defense would have had standing to contest the search of the hotel room. PCR. 1287. In particular, Tassone noted that the admission of the victims' car keys found in Mr. Wade's hotel room was damaging to the main defense theme that Mr. Wade was merely an accessory after the fact. PCR. 1142.

As to Eler's failure to object to comments made by the State during closing arguments, Tassone testified that he would have objected to comments to which Eler

13

had not objected. PCR. 1144. Tassone also testified that there were several pieces of evidence introduced by the State during the guilt phase that "probably" should have been objected to on admissibility grounds. PCR. 1149-1184. However, Tassone "agreed with Mr. Eler's strategy" not to object to "any information . . . that linked Tiffany Cole and Mr. Jackson together" so that they could be painted as the leaders of the crime. PCR. 1177. That being said, it would have been Tassone's first choice to keep a piece of evidence out rather than attempt to ameliorate the prejudice of the evidence after it had been improperly admitted—"if I could keep every mention of it out I would probably have done that." PCR. 1288.

Tassone also testified regarding the role Freida Ganey, Mr. Wade's mother, played in the plea negotiations. Because she was frequently speaking with Nixon, she was used by Nixon's lawyer to convince him to take the deal. PCR. 1292. However, she had a "fantasy" in her mind in which "she was going to talk Bruce into pleading guilty to second degree murder" and that Mr. Wade was going to get acquitted of all charges. PCR. 1293. Despite believing she held "delusional" beliefs, the defense did not have a realistic conversation with her or reach out to anyone else to convince Mr. Wade to take the plea deal before trial. PCR. 1294.

Ganey herself testified regarding the plea negotiations in this case. Ganey confirmed that she, like her son, had difficulty getting in contact with Eler. PCR. 1359-60. She also corroborated Mr. Wade's account that he had contemporaneous concerns about the fact that he received minimal visits from his trial attorney and that the case was not being investigated. PCR. 1360. Because Mr. Wade and Nixon had been

childhood friends, Ganey was talking to Nixon during this time through letters and jail calls. Despite knowing "very little about what was actually going on" in the case and not knowing "the rules of law," Ganey counseled Nixon to take the plea deal offered by the State. PCR. 1369-70.

As to Wade's plea deal, she could only recall one conversation with an attorney about having her convince her son to cooperate with the State and take the plea deal. PCR. 1371. She did recall speaking with the prosecution once about convincing Mr. Wade to testify but could not recall if trial counsel also said anything similar. PCR. 1380. At most they made an "offhand" remark to ask Mr. Wade to plead. PCR. 1370-71. And if the person who had made the remark was from the defense team it would have been Tassone, not Eler, who she could not get in contact with. PCR. 1380. No one from the defense team ever explained the evidence in the case until she was told in the hallway of the courthouse at trial that Mr. Wade would probably get the death penalty. PCR. 1371-72. Ganey made one mention to Mr. Wade about pleading during a conversation in the jail visitation room within the first six months of his arrest in 2005 and never mentioned it again. PCR. 1381-82.

After Ganey testified, the circuit court entered into evidence a letter she had sent the court on March 5, 2007, outlining her concerns regarding Eler's representation, including the almost complete lack of legal visits and the fact that Eler had not built any trust with Mr. Wade, who felt like his "attorney is working for the state." PCR. 1383-84. The letter noted that Mr. Wade had recently tried to talk with Eler and that he was "ready and willing to tell his story," but Eler brushed him off and told him they

15

had plenty of time to talk before trial. PCR. 1384. At Mr. Wade's court date on February 28, Mr. Wade had been told that he had until March 7 to decide whether or not he would go to trial. By the date of the letter a week later, Mr. Wade had not received any follow-up visits or communications from Eler. *Id.*[11]

Michael Hurst, the investigator hired by Eler in this case, also testified. PCR. 1600. Hurst, who made almost all of the visits to speak with Mr. Wade at the jail on behalf of the defense team, was "the conduit of information" between Mr. Wade and Eler. PCR. 1614. Mr. Wade discussed the facts of the crime with Hurst and admitted his involvement. PCR. 1617-18.

At the evidentiary hearing, postconviction counsel had Hurst walk through his contemporaneous notes in this case. On November 30, 2006, Eler asked Hurst to go to the jail and talk to Mr. Wade whether "he had a plea in mind and what amount of years he would agree to." PCR. 1602. On March 1, 2007, Mr. Wade asked Hurst to bring him the entire defense trial file so that he could review file because "he had until a certain date to decide if he was going to take a plea or go to trial and he wanted to review" the case. PCR. 1603. Hurst brought some, but not at all, of the trial file to the jail. PCR. 1603-04. Included in the items that Hurst did not provide to Mr. Wade were transcripts of interviews. PCR. 1605. By April 16, Wade informed Hurst that he still did not feel he could make a decision regarding whether to plead because Mr. Wade

---

[11]   At the February 28, 2007, status conference, Mizrahi stated on the record that "I can indicate to Mr. Eler that if Mr. Wade were to offer any kind of pleas in this case it would have to be done by March 7th." R. 928. Eler claimed to have "conveyed that to Mr. Wade." *Id.*

still had not been shown all of the discovery handed over in his case. Mr. Wade also noted that he still did not feel that he could trust Eler. *Id.* By May 8, 2007, Mr. Wade had still not been shown the entire trial file. PCR. 1608. From May through August, Mr. Wade made several more requests to see portions of the trial file and for Eler to meet with him to no avail. PCR. 1608-10.

Mizrahi, who made the plea offer, explained the plea negotiations in this case during the postconviction evidentiary hearing. Mizrahi had invited every codefendant, except Jackson, the opportunity to come forward "with a potential offer and provide a proffer of potential testimony." PCR. 1745. In exchange the codefendant would have to plead guilty to all counts except for first-degree murder which would be dropped to second degree, with a guideline sentence of about 52 years to life. *Id.*[12] Mizrahi stated that the parameters of this potential plea deal, although never formally made, were discussed with Mr. Wade and his counsel. PCR. 1747. In this case, plea negotiations got as far as Mr. Wade sitting down and meeting with Mizrahi in his office. PCR. 1747-48. Mizrahi recalled the plea negotiations and meeting happening in the Spring of 2007 within the two months before Jackson went to trial. PCR. 1748.[13]

**C. The blurred lines between the codefendants' legal teams at trial**

Evidence came to light at the postconviction evidentiary hearing of Cole regarding the blurred lines between the defense teams at trial. Attorney Quentin Till,

---

[12]    The original calculation of 52 years was based on the guideline score including counts of armed robbery. When it came to light that a toy gun was used, the counts were reduced to robbery and the guideline score was revised to 45 years. R Supp. 29-31.

[13]    Jury selection began at the Jackson trial on April 30 and the guilt phase the next day.

who represented Cole, noted that Eler, Alan Chipperfield, who represented Nixon, Richard Kuritz, who represented Jackson, and himself were in communication "every few days . . . about matters." Appendix B, at A23-A24. It also came to light that Mr. Wade and Cole shared the same guilt phase investigator. In preparation for trial, Eler hired investigator Michael Hurst. Hurst, however, was also hired by Till to assist in preparing for Cole's guilt phase. Till noted that he had been aware that Hurst was first retained by Eler in this case. *Id*. at A19. But Till, who had a longstanding relationship with Hurst, hired him anyways. In fact, a comparison of Hurst's billing records for his work on both cases demonstrates that on at least one occasion, Hurst billed for eleven hours' worth of work in each case for a total of 22 hours in a single day. *Compare* Appendix C (Cole billing), at A178 with Appendix D (Wade billing), at A188.

### D. The blurred lines between the codefendants' legal teams during postconviction

During postconviction, Mr. Wade was represented by attorney Ann Finnell. PCR. 51-52. On March 22, 2011, Finnell moved to have Rosalie Bolin retained as mitigation specialist for Mr. Wade's postconviction proceedings. PCR. 66-67. In the motion, Finnell noted that Bolin could act as both an investigator and a mitigation specialist. PCR. 66 ("[U]tilization of a mitigation specialist will alleviate the necessity for the use of an investigator as those two roles overlap."). Finnell later moved to have Bolin additionally appointed as an investigator. PCR. 82-83. The court granted both motions, PCR. 68, 92, and Bolin remained on the case through the entire initial postconviction proceeding, including assisting Finnell in the courtroom during Mr.

Wade's evidentiary hearing, PCR. 72-77, 94-96, 152-58, 195-98, 320-26, 479-83, 685-702, 709-13.

Bolin, however, had been retained by Wayne Henderson, the attorney representing Cole in her postconviction proceedings, on July 28, 2010. Appendix E (affidavit of Roslie Bolin). Despite working on both Mr. Wade's and Cole's postconviction cases, she never got off either and similarly remained on Cole's through the entire proceedings, including assisting Henderson in the courtroom during Cole's evidentiary hearing. Appendix F (excerpt of Cole evidentiary hearing) at A208 ("THE COURT: We 're in the courtroom. The time is 10:15. Ms. Cole is present as are counsel for the state and the defense. Ms. Bolin has [*sic*] a mitigation investigator."). Mr. Wade was never made aware of this conflict.

### E. Bruce Nixon tries to set the record straight but is ignored by postconviction counsel and silenced by the trial court at Mr. Wade's resentencing

Nearly a year after Mr. Wade's trial, Nixon admitted that his trial testimony was false and coached. On July 28, 2008, Nixon wrote to Mr. Wade's mother:

> **I just wish I didn't go along with what the State told me to do** they said I was gonna get like 20 years and they said I was gonna get you to get me some shoes they said they were gonna get me into school and let me get my diploma they said they were gonna let me talk to my whole family after I plead mercy to the court they said if I caught life the CO's would act different towards me. When I told my PD I wanted to take it to trial he said he would be mad at me cause I'm a stupid little kid who can't take responsibility for what happened. **He told me to sound guilty as possible when I told him I was on shrooms and pills and smokin weed he told me what to say and how to say it. That's why I sounded like a robot. I'm sorry I lied at trial I just did what my PD told me to do I don't remember what happened I remember a little bit cause I was**

**blacked out.** I don't know if I could but I want to take it to trial I know **I gave my life to the State and they manipulated me** . . .

Appendix G (Letter from Bruce Nixon to Frieda Ganey dated July 28, 2008), at A210-A211 (emphasis added).

During postconviction, in an April 4, 2012, interview with investigator Rosalie Bolin and postconviction counsel Finnell, Nixon again confirmed that his trial testimony was false. He confirmed that the State told him what to say, that he rehearsed his answers with the State, and that there were answers to questions at Mr. Wade's trial he gave using words that Nixon himself would have never used. Postconviction counsel did not raise a claim or present the facts of his false testimony. PCR. 385. At the postconviction evidentiary hearing, Nixon was called as a witness but only asked about potential mitigation testimony he could have provided at Mr. Wade's trial.

At Mr. Wade's resentencing, the State called Nixon as a witness. On the stand, Nixon attempted to repudiate significant portions of his prior testimony at Mr. Wade's original trial in front of the resentencing jury:

| | |
|---|---|
| MIZRAHI: | Did you not testify previously that you knew that Carol and Reggie Sumner were going to be murdered and buried in that hole? Not buried alive but they were going to be killed? |
| NIXON: | No, sir. |
| MIZRAHI: | You never testified to that? |
| NIXON: | What I said was what Alan Chipperfield wanted me to say. |
| MIZRAHI: | Okay. |

NIXON:              So now I am going to be honest about the whole situation.

RS. 200. However, the trial court had the jury taken out of the courtroom. Outside the

presence of the jury Nixon explained that his trial attorney "filled in the blanks:"

NIXON:              All right. During this episode all that happened we were on drugs, you know what I am saying, and I realize now I am 35 and Chipperfield he advised me what to say before I came in. You see what I am saying? And a lot of things I didn't -- I was on Xanax and methadone at the time so in and out of consciousness you feel what I am saying? So he filled in the blanks for me and told me what to say. I was guided into my testimony and now I am 35 I don't care what happens to me. I'm just trying to tell the truth of what happened.

RS. 202, 206, 207-09. The trial court refused to believe Nixon's statements that Nixon

testified as he was told to do by his attorney and essentially deemed him to be not

credible on the spot because his testimony was inconsistent with his trial testimony.

RS. 206. Both the State and the trial court repeatedly threatened that if Nixon did not

parrot his original testimony, his plea could be revoked, and he would face the death

penalty. RS. 207, 209.

Despite the fact that Nixon repeatedly stated that he just wanted to tell the truth

and was not asserting any privilege, the trial court determined that he would be

committing perjury and declared him unavailable for trial. RS. 210. The trial court did

not even allow the defense to confront and cross examine Nixon within the scope of

what he had testified to, instead decreeing that "there has been no direct examination."

*Id*. As Nixon was taken out of the courtroom, the trial court mocked his statements:

"I know. I heard. I am 35. I was under the influence of drugs. Alan Chipperfield told me -- ." RS. 211. The jury was instructed to disregard the testimony they had heard and instead his original trial testimony was read into the record.

## GOVERNING LEGAL STANDARDS

Mr. Wade seeks relief pursuant to 28 U.S.C. § 2254(a), which allows this Court to grant relief "on the ground that he is in custody in violation of the Constitution."

If a constitutional claim in this petition was decided on the merits by the Florida Supreme Court, this Court may not grant relief unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,    as determined by the Supreme Court of the United States;

or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under § 2254(d)(1), a state court decision can be "contrary to" clearly established law in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" and (2) "if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A claim is also "contrary to" clearly established law if it misidentifies the correct legal rule or "applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases." A state court's decision is an "unreasonable application" of federal law where it "identifies the correct governing legal principle . . . but unreasonably applies

that principle to the facts of the prisoner's case." *Id.* at 413. An "unreasonable" application is "different from an incorrect application of federal law." *Id.* at 410.

Alternatively, under § 2254(d)(2), a federal court may grant relief if a state court decision unreasonably determined the facts in light of the record before it. A state court determines the facts reasonably if "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015). This Court must look beyond a state court's factual findings and assess the reasonableness of its conclusions in light of the evidence that was before it. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Under § 2254(d)(1)-(2), therefore, habeas review is "highly deferential" for those claims decided on the merits in state court. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). However, "deference does not imply abandonment or abdication of judicial review," *Brumfield*, 135 S. Ct. at 2277, which means that "a federal court can disagree with a state court's [decision] and, when guided by AEDPA, conclude the decision was unreasonable." *Miller-El*, 537 U.S. at 340. The United States Supreme Court has not shied from finding that a state court's decision on a constitutional claim was contrary to law, or was unreasonable in applying the law or determining the facts. This is because the "whole thrust of AEDPA is essentially to reserve federal habeas relief for those cases in which the state courts acted unreasonably." *Pinholster*, 563 U.S. at 204 (Alito, J., concurring). That is exactly what happened here.

Additionally, the deference rules of § 2254(d) do not apply at all where the state court did not resolve a claim that is now being presented in a federal petition (or a

portion of such claim). If there was no "adjudication on the merits" in state court, a federal court will review the constitutional question *de novo*. *See Wiggins*, 559 U.S. at 534 ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice as neither of the state courts below reached this prong of the *Strickland* analysis."); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (same).

In reviewing a factual determination made by the state court, federal habeas courts presume that state court factual findings were correct. 28 U.S.C. § 2254(e)(1). A petitioner can overcome this presumption by clear and convincing evidence.

## CLAIMS FOR RELIEF

Mr. Wade's state convictions and sentence violate the Constitution of the United States. Under § 2254, Mr. Wade is entitled to federal habeas corpus relief from his unconstitutional confinement in state custody.

To the extent Respondent raises factual disputes with respect to specific claims in this petition, Mr. Wade will seek evidentiary and factual development.

To the extent that Respondent may assert any affirmative defenses to the petition or its individual claims, such defenses are waivable. *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996); *see also Moon v. Head*, 285 F.3d 1301, 1315 n.17 (11th Cir. 2002). Accordingly, Mr. Wade will respond to any such defenses if and when they are raised by Respondent.

All facts, allegations, and claims set forth in this petition and the other submissions made in this litigation are intended to be incorporated into each of the individual claims and allegations pleaded below.

## INTRODUCTION TO CLAIMS OF INEFFECTIVE
## ASSISTANCE OF COUNSEL

Claims 1 and 2 are claims of ineffective assistance of trial counsel. Claim 1 relates to trial counsel's ineffective assistance of counsel with respect to the deal Mr. Wade was offered to plead guilty to second degree murder. Claim 2 relates to trial counsel's ineffective assistance of counsel during the guilt phase of Mr. Wade's trial. Because the claims and subclaims draw on a common background related to counsel's ineffective representation during the trial process, one is provided here at the outset, followed by the separate pleading of each claim.

## I.     Trial counsel Refik Eler's background – "It was like he had no attorney"[14]

During the guilt phase, Mr. Wade was represented by attorney Refik Eler. Eler has gained national infamy as one of the "worst death penalty lawyers in America." Radley Balko, *The Worst Death Penalty Lawyers in America*, WASH. POST (November 6, 2015); *see also* Robert Smith, *The Worst Lawyers*, SLATE (November 4, 2015). This reputation was hard earned: Eler has had more clients end up on death row than any other defense attorney in the history of Florida. But not all have stayed there. Eler has been found ineffective in three death penalty cases and one noncapital case. *See State v. Morrison*, 236 So. 3d 204, 220 (Fla. 2016); *Shellito v. State*, 121 So. 3d 445, 456 (Fla. 2013); *Douglas v. State*, 141 So. 3d 107, 117 (Fla. 2012); *Spargo v. State*, 132 So. 3d 354, 356-57 (Fla. 1st DCA 2014).

---

[14]    Description of Eler's performance in one of the four cases in which he was found to have provided ineffective assistance of counsel. Emily Bazelon, *Where the Death Penalty Still Lives*, N.Y. TIMES (August 23, 2016).

In *Morrison*, Eler was found ineffective for failing to adequately investigate and prepare for trial. 236 So. 3d at 218. Eler, who took over preparation of the penalty phase from the public defender's office, testified that after he got the case, he conducted essentially no investigation because the public defender "had completed virtually every aspect of the investigation in the case" and that based on the trial file he received from the public defender's office the case "was ready for trial." *Id*. at 219-20. In fact, the investigation was "absolutely not" ready for trial when Eler took over and the public defender had included a memorandum in the trial file indicating the several lines of investigation that still needed to be conducted that Eler simply never followed up on. *Id*. at 219. Therefore, Eler was found to be ineffective because "[i]t is apparent from the record that trial counsel performed almost no investigation" despite the fact that "there were sufficient facts in this case to place trial counsel on notice that further investigation . . . was necessary." *Id*. at 220.

In *Shellito*, Eler was found ineffective for failing to investigate and prepare for the penalty phase of a capital trial. 121 So. 3d at 456. Despite being appointed months before trial, Eler began his penalty phase investigation shortly before the guilt phase and conducted almost all of the unreasonable investigation during the time between the guilt phase and penalty phase. As a result, Eler failed to "follow up" on several key avenues of investigation and made, at best, a "marginal attempt" to pursue others. *Id*. Therefore, because of Eler's ineffectiveness, "no mental health mitigation, statutory or otherwise" was presented during the penalty phase despite the defendant's severe brain damage, mental health issues, and extreme sexual and physical abuse. *Id*. at 456-59.

26

In *Douglas*, Eler once again failed to investigate and prepare for trial in a death penalty case. 141 So. 3d 117. After Eler retained an expert who noted in his report finding the defendant competent that there was significant follow up investigation needed—including basic investigatory steps such as receiving and reviewing records and interviewing family members—counsel conducted zero further investigation over the next two years before trial and resultingly no mental health evidence was presented at trial, despite the defendant's brain damage, 75 IQ, and his history of severe abuse. *Id*. at 117-19. Although Eler testified during the postconviction evidentiary hearing that he conducted an investigation, the court refused to credit this testimony given that his billing records completely contradicted his testimony. *Id*. at 122 (noting that "there is no evidence" that "trial counsel conducted any type of investigation," "aside from billing records denoting the receipt of Dr. Krop's preliminary report").

In *Spargo*, Eler was found ineffective for "failing to adopt [the defendant's] motion to withdraw his guilty plea prior to sentencing on the ground that the plea had never been formally accepted by the trial court." 132 So. 3d at 355-56. As the District Court of Appeal noted, the defendant attempted to assert his right to withdraw his plea by "present[ing] his trial attorney with letters and pro se motions to withdraw his plea, which the attorney refused to adopt." *Id*. at 357. Therefore, Eler "was deficient in failing to adopt and present appellant's motions to withdraw the plea because, under these circumstances, appellant had an affirmative right to withdraw the plea, and counsel's failure to correctly advise or advocate appellant's desire in this instance constitutes deficient performance." *Id*.

27

As a result of his repeated ineffectiveness, Eler was publicly admonished by the

Florida Bar in 2019:

> ADMONISHMENT: Refik Werner Eler, your actions have discredited the legal profession of the State of Florida. Such conduct cannot be tolerated by your fellow lawyers and should not be tolerated by you. Pride in your profession demands that you not violate the Rules of Professional Conduct again.

*Florida Bar v. Eler*, Florida Bar File No. 2019-00,252(4C) (August 28, 2019).

These cases demonstrate Eler's persistent inability to provide his clients with the

representation to which they are constitutionally entitled. Despite the fact that his

clients were facing the death penalty, Eler routinely refused to investigate and prepare

for trial. Moreover, his postconviction testimony defending his actions in each case

was found incredible and disbelieved as mere *post hoc* justifications. Eler's failings

across these cases—like his failings in this case—were fundamental and constituted a

complete abdication of his duty under the Sixth Amendment to provide his clients with

effective assistance of counsel.

## II.    Legal standards governing claims of ineffective assistance of counsel

Under the Sixth Amendment, defendants are entitled to effective assistance of

counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). To establish that counsel

performed deficiently, a defendant must show that counsel acted "below an objective

standard of reasonableness" in light of "prevailing professional norms." *Id*. at 688. The

Supreme Court explained that reasonable attorneys make "strategic choices . . . after

thorough investigation of law and facts relevant to plausible options." *Id*. at 690. But

counsel's choices "made after less than complete investigation" are deficient unless

"reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 532. A failure to reasonably prepare and investigate is classic deficient performance. *See id.*; *see also Kimmelman v. Morrison*, 477 U.S. 365, 384-88 (1986). Every alleged deficiency is evaluated on a case-by-case basis with "few hard-edged rules," so that anything that contravenes professional norms can be deficient. *Rompilla*, 545 U.S. at 381-83 (counsel failed "to examine the court file" for defendant's prior conviction); *see also*, *e.g.*, *Hinton v. Alabama*, 571 U.S. 263, 272 (2014) (counsel had a mistaken belief about ability to pay for expert witness under state law); *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989) (counsel failed to obtain a transcript of a witness's testimony); *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986) (failure to interview alibi witnesses).

To establish prejudice, counsel's deficiency must have "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable" probability does not require a showing of "more likely than not" that the deficiency harmed the defendant. *Porter v. McCollum*, 558 U.S. 30, 44 (2009). Rather, a "reasonable probability" is simply one that is "sufficient to undermine confidence in the outcome . . . which is a lesser showing than a preponderance of the evidence." *Sealey v. Warden, GDCP*, 954 F.3d 1338, 1355 (11th Cir. 2020).

The Supreme Court has enunciated prejudice standards when the ineffective assistance results in the defendant foregoing a potential plea deal and taking his case to trial. *See Lafler v. Cooper*, 566 U.S. 156, 162 (2012) ("During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'") (quoting *McMann v. Richardson,* 397 U.S. 759, 771 (1970)); *see also Missouri v. Frye*, 566 U.S. 134 (2012). A defendant establishes prejudice by showing that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court," "that the court would have accepted its terms," and that "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 U.S. at 164; *see also id*. at 167-68 ("The favorable sentence that eluded the defendant in the criminal proceeding appears to be the sentence he or others in his position would have received in the ordinary course, absent the failings of counsel.").

Additionally, the Supreme Court has established a presumption of prejudice when trial counsel endeavors under a conflict of interest. "To establish a Sixth Amendment claim, a criminal defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Burden v. Zant*, 24 F.3d 1298, 1304–05 (11th Cir. 1994) (internal quotations omitted). Under *Cuyler v. Sullivan,* 446 U.S. 335, 348-49 (1980), a defendant must establish (a) that his defense attorney had an actual conflict of interest, and (b) that this conflict adversely affected the attorney's performance.

"To satisfy the actual conflict prong, a defendant must show something more than a possible, speculative, or merely hypothetical conflict." *Reynolds v. Chapman*, 253 F.3d 1337, 1342–43 (11th Cir. 2001) (internal quotations omitted). "To prove adverse effect, a defendant needs to demonstrate: (a) that the defense attorney could have pursued a plausible alternative strategy, (b) that this alternative strategy was reasonable, and (c) that the alternative strategy was not followed because it conflicted with the attorney's external loyalties." *Id*. at 1343. "Once it is established that both prongs of the *Cuyler* test . . . have been met, a defendant need not show prejudice in order to obtain reversal of his conviction." *Burden*, 24 F.3d at 1304.

**Claim 1:    Trial counsel rendered ineffective assistance resulting in Mr. Wade not entering into a plea deal for second-degree murder and a term-of-years sentence**

Refik Eler, who has previously been found ineffective four times including during a plea negotiation, was prejudicially ineffective in representing Mr. Wade regarding the State's offer for Mr. Wade to plead guilty to second-degree murder for a potential sentence of 45 years in exchange for testifying against his codefendants. Eler's unreasonable representation violated Mr. Wade's constitutional rights under the Sixth and Fourteenth Amendments.

**I.    Trial counsel's performance was deficient**

Eler's performance was deficient. Eler openly conceded during the state postconviction evidentiary hearing that he had essentially no meaningful attorney-client contact with Mr. Wade, particularly during the time the State attempted to

31

engage in plea negotiations. Despite Mr. Wade repeatedly requesting the guiding hand of counsel to assist him in making a knowing and intelligent decision as to whether to enter into a plea deal, Eler unreasonably failed to counsel and advise his client. Instead, Eler left the task up to an investigator with no legal training and a conflict of interest.

As an initial matter, this was not a case in which the defendant would not have accepted the plea absent the ineffective assistance of counsel. Mr. Wade was actively working to understand the case against him and repeatedly told his defense team that he wanted to make an informed decision as to whether to go to trial or plead to second degree murder. But these calls went unheeded, and the best Mr. Wade could do was speak to the investigator and review the parts of the trial file that he was shown. This is confirmed by Hurst's contemporaneous memos, PCR. 627 ("He has until a certain date to decide if he is going to take a plea or go to trial and he wants to review everything."), and Mr. Wade's mother's letter to the trial court just two days before the plea offer was set to expire in which she noted that Mr. Wade was "ready and willing to tell his story," PCR. 1384.

Moreover, this was not a case in which the defendant "consistently professed his innocence both before and after trial." *Teers v. United States*, 739 F. App'x 960, 966 (11th Cir. 2018) (citing *Osley v. United States*, 751 F.3d 1214, 1225 (11th Cir. 2014)). As Eler and Hurst testified in postconviction, Mr. Wade did not maintain his innocence to his defense team before trial, PCR. 1630, and at trial, the defense strategy was to argue that he played a diminished role as an accessory after the fact, PCR. 1632. Trial

counsel was thus fully aware that Mr. Wade was researching whether or not to plead and that Mr. Wade had not foreclosed this avenue as a potential outcome in this case.

But because trial counsel was deficient, Mr. Wade was not given a reasonable opportunity to accept the plea offer. Plea negotiations are "almost always the critical point for a defendant" in his case. *Frye*, 566 U.S. at 144; *see also Lafler*, 566 U.S. at 165 (noting that "defendants cannot be presumed to make critical decisions without counsel's advice" during "pretrial critical stages" of the case). As such, trial counsel has a duty to communicate offers to his client and to keep him informed. *Id* at 145. As the Eleventh Circuit has explained, "counsel has an obligation to consult with [his] client on important decisions and to keep him informed of significant developments in the course of his prosecution." *Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991). This duty is heightened when the plea deal is at the informal stage because "[o]therwise, such informal plea negotiations would be unlikely to turn into formal plea offers." *Carmichael v. United States,* 659 F. App'x 1013, 1022 (11th Cir. 2016).

Eler failed in the duties and obligations he owed Mr. Wade. Eler unreasonably failed to establish a working relationship between himself and his client. He made minimal to no attempt to counsel and advise Mr. Wade as to whether to plead guilty or go to trial. In fact, as he himself conceded, Eler only had six total legal visits with Mr. Wade at the jail during the entire course of his representation. And as Eler acknowledged, speaking with his client in the courtroom before or after pretrial

conferences for a few minutes was not an adequate substitute for legal visits in the jail.[15]

This is not what reasonable counsel would have done. Reasonable counsel, pursuant to Supreme Court precedent and the relevant ABA guidelines, would have worked to establish a relationship with his client. Reasonable counsel would have met with and explained the pros and cons of pleading guilty and the case that the State would make against Mr. Wade at trial in both the guilt and penalty phases. But Eler, has even he himself conceded, never made reasonable attempts to fulfill these obligations.

As the Supreme Court has repeatedly held, the American Bar Association's guidelines for the performance of counsel are "important guides" when evaluating the performance of counsel, particularly in death penalty cases. *Frye*, 566 U.S. 134, 145 ("Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides.") (internal citation omitted); *Wiggins*, 539 U.S. 510, 522 (noting that the evaluation of counsel's performance under the ABA guidelines is "clearly established" by Strickland) *see also Rompilla*, 545 U.S. at 387 (describing action trial counsel

---

[15]    Notably, when the meeting occurred in ASA Mizrahi's office regarding the plea deal on February 12, 2007, Eler's legal visit two months prior in December had been the only one he had made since his initial visit in 2005. PCR. 1652-53. Which is to say that Mr. Wade was thrust into a meeting with the trial prosecutor regarding whether he should plead guilty or face the death penalty after having virtually zero meaningful contact with his trial attorney.

unreasonably failed to take as "not simply a matter of common sense" but also an "obligation" under ABA guidelines).

The guidelines in effect at the time of Mr. Wade's trial specifically address counsel's role in obtaining a potentially favorable plea deal for their client. *See*, *e.g.*, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.9.1(B) (rev. ed. 2003) ("Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision."); ABA Guidelines 10.9.1(C) ("Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies."). Although the decision to plead guilty ultimately rests with the defendant, it is the duty of his counsel to ensure that the decision to either plead guilty or go to trial is fully informed and knowing, intelligent, and voluntary. ABA Guidelines 10.9.2. These duties are not diminished even if a client shows initial opposition to pleading guilty. *See* ABA Guidelines 10.9.1(E) ("[A] client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.").

But Eler unreasonably failed to live up to these guidelines. *See Frye*, 566 U.S. 134, 145 ("The American Bar Association recommends defense counsel "promptly communicate and explain to the defendant all plea offers made by the prosecuting

attorney[.]"). He did nothing to ensure that Mr. Wade made a knowing or intelligent decision. He ignored Mr. Wade's repeated requests to make an informed decision. In fact, the meeting between Mr. Wade, counsel, and the prosecutor occurred during a time in which Eler had not had a legal visit with Mr. Wade at the jail in months. And Eler certainly did not "fully explain" the circumstances surrounding the plea deal, nor did he fulfill his "obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition" that would be favorable to Mr. Wade. ABA Guidelines 10.9.1(A).

Although Mr. Wade showed some initial opposition to pleading guilty early in the case, his mother's letter to the trial court and his repeated requests to be informed about the case against make it clear that he was sincerely interested in making an informed decision as to whether he should plead guilty. Instead, Eler unreasonably failed to act. These failures were rooted in Eler's ultimate failure to "make every appropriate effort to establish a relationship of trust with the client" and "maintain close contact with the client." ABA Guidelines 10.5. Eler made six visits to the jail over a period of two years. He conceded that this was unreasonable and caused significant problems in his representation.

Eler's unreasonable failures in this case are entirely consistent with the four other cases in which he has already been found to have rendered deficient performance. His previous failures to investigate or prepare are essentially identical to his unreasonable failure to take more than bare minimal steps to counsel or advocate for Mr. Wade during the plea negotiations in this case. *Cf. Shellito*, 121 So. 3d at 456

36

(finding Eler deficient for failing to "follow up" and making "marginal" attempts in preparing case); *Morrison*, 236 So. 3d at 218 (finding Eler deficient where he "performed almost no investigation"). Notably, Eler has already been found ineffective with respect to a plea deal because, like here, he failed "to correctly advise or advocate" his client's desire with respect to the plea. *Spargo*, 132 So. 3d at 355-57.

Instead of counseling and advocating for his client, Eler delegated his job as lead counsel to the guilt-phase investigator. In any case, delegating the job of counseling a client as to whether they should accept a plea deal to a non-attorney member of the defense team would be unreasonable. But here, Hurst had a direct conflict of interest. In this case, he was utilized and paid by the trial counsel representing Tiffany Cole. As Quentin Till, Cole's counsel, made clear, Hurst and Till had a longstanding relationship and Hurst was his preferred investigator. App. B at A11. Thus, Eler delegated the responsibility of counseling a defendant facing the death penalty to someone not only untrained in the law but laboring under a conflict of interest.

Moreover, to the extent that Eler did delegate the task of convincing Mr. Wade to take the plea deal, he was unreasonable in failing to utilize Mr. Wade's mother, who was instead recruited by the attorney representing Mr. Wade's codefendant and only used to convince Nixon to take the plea deal. If trial counsel did not believe he had the capability to discuss pursuing the plea deal with Mr. Wade, the course reasonable counsel would have taken would have been to request support from the person closest to Mr. Wade, or potentially any other family or friends that could have been willing to speak with him. Instead, Eler never spoke with Mr. Wade's mother.

Finally, it is important to note that all of this occurred against a ticking clock. *Frye*, 566 U.S. at 145 (finding counsel deficient where "it is evident that Frye's attorney did not make a meaningful attempt to inform the defendant" of the plea offer "before the offer expired"). As the State made clear on the record in court, the time limit on reaching any plea deal in this case was March 7, 2007, in order to give the State time to prepare the witness for the Jackson trial. But Eler did not even visit Mr. Wade in the jail until the eleventh hour and, as Mr. Wade made clear, months later Mr. Wade still had not had the case against him explained to him. In fact, contemporaneous notes also show that Mr. Wade erroneously believed that he still would have had the ability accept the plea deal after the March 7 deadline given that in mid-April, Mr. Wade was still indicating to Hurst that he had not yet decided whether to accept the plea deal that had long expired. PCR. 1605. Therefore, trial counsel was deficient.

## II.    Mr. Wade was prejudiced by trial counsel's unreasonable performance

### i.    This Court should presume prejudice based on the conflict of interest

This Court should presume prejudice because trial counsel's investigator—the "conduit of information"—had an actual conflict of interest. Because trial counsel was rarely meeting with Mr. Wade, almost all information, particularly regarding the plea offer, was given through Hurst as the guilt phase investigator. PCR. 1614. However, Hurst also worked as a guilt-phase investigator for Cole, Mr. Wade's codefendant. App. C. This was a clear conflict of interest, given that the main trial defense of both codefendants was to minimize their own role at the expense of the other codefendants. *See Boykin v. Webb*, 541 F.3d 638, 647 (6th Cir. 2008) ("Where, as here, the facts at trial

38

show that a defendant's best defense is to point the finger at his co-defendant, it almost goes without saying that the two codefendants cannot be represented by the same trial counsel."). Because Hurst was employed by Eler in this case, the conflict is imputed to Eler. *Reynolds*, 253 F.3d at 1343.[16]

Here, there was a clear reasonable alternative strategy. Trial counsel was unreasonable in allowing the "conduit of information"—*i.e.* the only person who was actually advising Mr. Wade as to whether to accept the plea offer, PCR. 1614—to be an investigator with a conflict of interest instead of having a licensed attorney without an actual or imputed conflict of interest meeting with and counseling Mr. Wade during the plea negotiations. Therefore, because there was a clear possibility that the interests of one of the codefendants could be "sacrificed for the benefit of the other," this "blossomed into an actual conflict" under *Cuyler*, and this Court should presume prejudice. *Reynolds*, 253 F.3d at 13.

### ii. Even if this Court does not presume prejudice, there is a reasonable probability that the parties would have agreed to the plea deal and that the trial court would have accepted it

Even if this conflict did not establish the presumption of prejudice, there is still a reasonable probability that trial counsel's deficient performance adversely affected the plea process. First, there is a reasonable probability that the plea off would have been presented to the court—which is to say, Mr. Wade would have accepted the plea and the prosecution would not have withdrawn it in light of any intervening

---

[16]     In addition to hiring him, Eler and Hurst shared office space. PCR. 1713-14.

circumstance. *Lafler*, 566 U.S. at 164. The record establishes that Mr. Wade undertook extensive reasonable attempts to make an informed decision as to whether to accept the plea offer and repeatedly asked counsel to meet with him to no avail while the window to accept the offer was still open. As his mother's letter to the court makes clear, Mr. Wade was "ready and willing to tell his story," and he wanted to meet with trial counsel and review the trial file to determine whether pleading was in his best interest. PCR. 1384. But Eler still had not walked him through the case and evidence against him months after the window was closed.

As the Eleventh Circuit has long recognized, it does not matter that the plea deal in this case was only at the informal stage. *See, e.g., Carmichael*, 659 F. App'x. at 1022; *Reynolds*, 253 F.3d at 1347. Even though the negotiations never reached the formal offer stage as a result of counsel's deficient performance, as Tassone noted, the parties had "real discussions" in this case and even went as far as to meet in Mizrahi's office. PCR. 1118. And there were no intervening circumstances that would have caused the prosecution to withdraw the deal, given that the State did not oppose Nixon receiving a term-of-years sentence based on his assistance. R Supp. 48-50.

Second, as to whether the trial court would have accepted the plea offer, this Court need not look far for a similarly situated defendant: Bruce Nixon. *Cf. Lafler*, 566 U.S. at 167–68 ("The favorable sentence that eluded the defendant in the criminal proceeding appears to be the sentence he or others in his position would have received in the ordinary course, absent the failings of counsel."). In this case, every codefendant except Jackson was offered the same terms: testify against the other codefendants and

40

they could plead guilty to second-degree murder. Nixon took this deal, and the trial court sentenced him to the minimum guideline sentence of 45 years based on his assistance to the State's case. R Supp. 52. There is a reasonable probability that the court would have accepted the deal for Mr. Wade and given him the same sentence.

The third prong of prejudice—that the conviction, sentence, or both, would have been less severe if the plea deal had been accepted than what was actually imposed—has clearly been established in this case. *Lafler*, 566 U.S. at 164. Mr. Wade was convicted of two counts of first degree murder and resentenced to life in prison without the possibility of parole after originally been sentenced to death. *See* App. A. Under the terms of the plea deal, he would have pleaded guilty to second degree murder, and, like Nixon, there is a reasonable probability that he would have been sentenced to a term-of-years sentence.

**Claim 2:    Trial counsel rendered ineffective assistance during the guilt phase**

Mr. Wade brings six ineffective assistance of counsel claims related to Refik Eler's deficient performance during the guilt phase, including failing to move to suppress evidence, failing to object to inadmissible evidence, and failing to object to improper testimony. Because this Court should address the prejudice of trial counsel's failures cumulatively, Mr. Wade will address prejudice at the end of this claim.

**I.    Trial counsel was ineffective in failing to file a motion to suppress and/or object to the presentation of the evidence recovered from hotel room 302**

After law enforcement tracked down Jackson, Cole, and Mr. Wade to the hotel, they were arrested on July 14, 2005. As noted above, Jackson and Cole were arrested

41

in room 312 and Mr. Wade was arrested in room 302. Cole had paid for both rooms. After securing a search warrant, law enforcement searched both rooms, finding bank records and a check made out to Mr. Wade in room 312 and the victims' car keys in room 302. In support for probable cause for the search warrant, Officer James Rowan swore to the following:

> Investigators further identified the victim's bankcard from Heritage Trust Federal Credit Union had been used since the couple had been missing. Investigators obtained video of the individual using the victim's card. The video showed a white male subject using the card to access the ATM to obtain money. The suspect was exiting a vehicle, which appeared to be a silver 2005 Mazda RX–8. Tiffany Cole rented a silver RX–8 from Triangle Rental Car in Charleston, S.C. Tiffany Cole failed to return the vehicle per the rental contract. A tracking device in the vehicle was checked by the rental company and revealed the vehicle had been in the vicinity the victim's vehicle was located in. Contact was made with Tiffany Cole's family at her known address in Ladson, S[.]C. Cole's brother took detectives to the location to be searched to locate Cole. Upon locating Cole she was found to be in the company of a white male matching the photographs of the individual using the victim's ATM card to make a cash withdrawal from an ATM in Jacksonville, and Charleston. Based on the information obtained by Det. Rowan, from other law enforcement officers, there is reason to believe that Cole and her accomplices may have caused harm to the victim[s] and have been using the victims['] financial resources without permission, and further that there may be evidence of the aforementioned crimes under the control of Cole and her accomplices within the locations to be searched.

*Wade*, 156 So. 3d at 1016 (alterations in original).

In postconviction, Mr. Wade raised the claim that trial counsel was ineffective for failing to move to suppress the fruits of the search of room 302 based on the fact that the affidavit was defective. Although Mr. Wade was the sole occupant of room 302 and there were no items in the room indicating that Cole or any other female was staying in the room, the affidavit completely omitted any mention of Mr. Wade, that

42

he was the sole occupant of room 302, or any information showing that law enforcement had probable cause to arrest Mr. Wade.

"An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). A hunch cannot form the basis for a search warrant, but that is exactly what happened here under the court's interpretation. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'") (quotation omitted); *Poolaw v. Marcantel*, 565 F.3d 721, 729 (10th Cir. 2009) ("[A] court may not 'arrive at probable cause simply by piling hunch upon hunch.'" (quotation omitted))). Taking the Florida Supreme Court's analysis at face value that nothing in the protective sweep made it to the affidavit, *Wade*, 156 So. 3d at 1015, Officer Rowan had nothing more than a hunch that the person in room 302 was one of Cole's accomplices.

This is borne out by the timeline of the arrests and searches. Officer Rowan and a U.S. Marshal first went to room 302. T. 628. The U.S. Marshal knocked on the door of room 302, identified himself as hotel management, and arrested Mr. Wade when he opened the door. T. 628. The only person they saw in that room was Mr. Wade. T. 628. Officer Rowan and the U.S. Marshal then went to room 312. T. 629. The U.S. Marshal knocked on that door and again identified himself as hotel management. T. 629. Inside room 312 they saw Cole and Jackson. T. 630. Afterwards, Officer Rowan sought a search warrant for both rooms by swearing an affidavit. At that time, law enforcement only had evidence linking Cole and Jackson to the crime, not Mr. Wade.

43

Officer Rowan's affidavit shows that he had information of a white male using the Sumners' card to retrieve money from an ATM who matched the description of the person who was with Cole in room 312. The only evidence that any person other than Cole and the "white male matching the photographs" was involved in the crime was Officer Rowan's vague allegation that Cole had "accomplices." But nothing in Officer Rowan's affidavit backs that conclusion. So, prior to Officer Rowan entering room 302, law enforcement had no awareness that Mr. Wade had any connection to the case and after he was arrested, the only thing linking him or room 302 to the crime was the fact that the room had been rented by Cole.

The affidavit was defective under *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* requires the petitioner to offer proof the officer seeking a search warrant acted with "deliberate falsehood or . . . reckless disregard for the truth." 438 U.S. at 171. Under Florida law, an omission constitutes a falsehood under *Franks*. *Johnson v. State*, 660 So. 2d 648 (Fla. 1995). The Florida Supreme Court has enunciated a two-step test for omissions under *Franks*: "(1) the reviewing court must determine whether the omitted material, *if added* to the affidavit, would have defeated probable cause, and (2) the reviewing court must find that the omission resulted from intentional or reckless police conduct that amounts to deception." *Id.* at 656 (emphasis in original).

Mr. Wade made that showing under *Franks* and *Johnson* because Officer Rowan omitted relevant information that Mr. Wade was the sole occupant of room 302 at the time of his arrest, omitted the fact of his arrest, omitted the fact that at the time of his detention police knew he was not the user of the Sumners' ATM card, omitted the fact

44

that Jackson and Cole were the occupants of room 312 and the fact of their arrest and continued detention, and omitted the fact that law enforcement had no information linking Wade to the use of the Sumners' ATM card, or to any aspect of the disappearance of the Sumners.

The Florida Supreme Court denied relief. First, the court found that Mr. Wade's contention that his arrest was illegal was "a red herring" because "[t]he law enforcement officers seized the evidence from room 302 during the search conducted under the search warrant, not during the protective sweep that followed Wade's arrest. *Wade*, 156 So. 3d at 1015. Second, the court found that even if Officer Rowan had provided the magistrate judge with additional information, that information would not have negated "the probable cause that existed to search the room" because Officer Rowan knew Cole had rented two rooms, that Cole was traveling with "two men," and that the man photographed at the ATM was not Cole's "sole accomplice." *Id.* at 1017. In doing so, the court relied on Officer Rowan's testimony, including that the officers had learned that Cole "had returned to South Carolina with a couple of guys," despite the fact that the testimony the court relied upon included information not included in the affidavit. *Id.* at 1016.

The Florida Supreme Court's adjudication of this claim was unreasonable. First, the court unreasonably relied upon facts to support probable cause that were not included in Officer Rowan's affidavit. Nowhere in the affidavit is there any mention of Cole traveling with two men. The only statements Officer Rowan swore to of individuals helping Cole were of a white man trying to access the ATM who clearly

matched Jackson's description, and the conclusory allegation that Cole had "accomplices." But by the time the affidavit was drawn up, law enforcement had arrested Jackson in room 312 with Cole. Considering that Officer Rowan sought a search warrant *after* seeing Mr. Wade in room 302, there is a high likelihood he sought to search room 302 on a hunch there would be incriminating information in that room. In achieving his desired result, Officer Rowan's affidavit was misleading by not providing evidence that likely would have defeated the probable cause necessary to the issuance of a search warrant of room 302.

Second, the court's determination was contrary to or an unreasonable application of clearly established federal law. There is nothing in Officer Rowan's affidavit indicating that the person residing in room 302 of the hotel was involved in the disappearance of the Sumners. Under the court's interpretation of the evidence, Officer Rowan would have had probable cause for a search warrant no matter who was found in room 302 because any person, male or female, could have been one of Cole's "accomplices." This was clearly nothing more than an improper hunch, rather than an informed determination that there was "a reasonable probability that contraband" would be found in room 302. *Pagan v. State,* 830 So.2d 792, 806 (Fla. 2002). Officer Rowan very clearly wanted the affidavit to appear as though it was solely connected to Cole and the inclusion of a third party who police could not connect to Cole would have broken that link.

Law enforcement knew that Cole and Jackson, the two they could easily tie to the crime, were staying in room 312. Law enforcement had no idea who Mr. Wade

46

was or what, if any, role he played when he was arrested from room 302. Clearly any reasonably prudent officer would assume that Cole and Jackson kept any relevant evidence under their dominion in room 312. *See Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir. 2018) ("As a general rule, it is reasonable . . . to assume that a person keeps his possessions where he resides."); *cf. United States v. Ingram*, 720 F. App'x 461, 469 (10th Cir. 2017) (noting that law enforcement can rely upon the commonsense proposition that a drug dealer is going to keep his drugs in his own residence in seeking a search warrant). By omitting Mr. Wade's existence entirely from the affidavit for probable cause, Officer Rowan makes clear what a reasonable person would have expected: a magistrate would not have signed off on the warrant if they had been truthful about the presence of an unknown person for whom law enforcement had no connection to the conspiracy to be the sole occupant of room 302.

Because § 2254(d) deference does not apply, this Court should review the claim de novo. Trial counsel's failure to move to suppress the fruits of the search of room 302 was based entirely on an unreasonable mistaken understanding of law. Eler testified in postconviction that he believed he did not have a good faith basis to file a motion to suppress because he was "not sure [Mr. Wade] had standing." PCR. 1635. This was based on the fact that Cole rented the room, rather than Mr. Wade. His understanding was erroneous, Mr. Wade had standing under clearly established Supreme Court precedent. *United States v. Jeffers*, 342 U.S. 48, 52 (1951). Eler's failure to file a motion to suppress based on his failure to conduct basic research into the relevant law constitutes "quintessential" deficient performance. *Hinton*, 571 U.S. at

47

274 ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

Moreover, Eler's apparent second justification for not filing the motion—the State introducing the victims' car keys was not "damning" because "here's a guy that gets sucked into after the fact getting rid of all this evidence"—does not hold water. His actions contradict his testimony.[17] Eler adopted the codefendant's motion to suppress the fruits of the search of room 312, where there was "some evidence pointing to [Mr. Wade]'s guilt," as well as Jackson and Cole's. PCR. 1637. Yet Eler did not file his own motion to suppress evidence that pointed to Mr. Wade's guilt in Mr. Wade's room. Additionally, law enforcement found more than just a set of keys in his room. They also found a cell phone, which the State then used to refute Eler's "strategy" of minimizing Mr. Wade's involvement because it enabled the State to link Mr. Wade to the commission of the robbery and murders through Nixon's testimony that they were communicating through cellphones during the conspiracy. Thus, Eler's testimony bears the hallmarks of a *post hoc* justification for his deficient performance. *Wiggins*, 539 U.S. at 526–27 ("When viewed in this light, the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing.").

---

[17]    His attempt to diminish the car keys is also belied by his testimony at another point that the keys being in Mr. Wade's room made it a "difficult" guilt phase case. PCR. 1629.

Additionally, this Court should look to penalty-phase counsel's testimony regarding the failure to file the motion. Tassone testified he could not recall any conferences with guilt phase lead attorney Eler on whether to file a motion to suppress the evidence in room 302. PCR. 1139. Tassone, however, would have liked to suppress the keys and cell phone. PCR. 1139-1140. Tassone was aware that Eler adopted a motion to suppress by one of the codefendants regarding the evidence in room 312, but if Tassone had known that Eler did not filed a motion to suppress the evidence specific to Mr. Wade, he "probably would have filed a much more or a more specific Motion to Suppress." PCR. 1140-41. Therefore, this Court should find that trial counsel was deficient in failing to file a motion to suppress the fruits of the search of room 302.

## II.    Trial counsel was ineffective in failing to object to the introduction of items seized in hotel room 312

At trial, the State introduced evidence seized from hotel room 312, including bank records from the victim and a check made out to Mr. Wade. Despite adopting Mr. Wade's codefendant's motion to suppress this evidence, trial counsel failed to lodge an objection to the introduction of this evidence at Mr. Wade's trial.

The Florida Supreme Court denied relief on this claim. The court concluded that "[t]he bank records and the check were not substantially more unfairly prejudicial than probative" and that "trial counsel made a reasonable, strategic decision not to object." *Wade*, 156 So. 3d at 1019. Regarding unfair prejudice, the court explained that "Wade's argument that there was no evidence that he knew about the check may

49

reduce its probative value but does not render it irrelevant or unfairly prejudicial." *Id.* The court's adjudication of this claim was as an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts

Although the court recognized that the lack of any evidence that Mr. Wade's had knowledge of the check reduced its probative value, the court unreasonably found that the evidence from room 312 was not irrelevant or unfairly prejudicial. At trial the State was able to argue to the jury that the check and bank statements tied Mr. Wade to the crime, despite presenting zero evidence that he had any knowledge of the items' existence. The introduction of the items, coupled with the State's argument, confused the issues, confused the culpability of the parties, and mislead the jury as to Mr. Wade's culpability.

By insulating counsel's failure to object as strategic, the court unreasonably overlooked that Eler had previously adopted Jackson's motion to suppress the evidence from room 312. If Eler's strategy was to allow damaging evidence to come in to show that Mr. Wade was simply "getting rid of things after the fact" and "stay credible with the jury," then it would have made no sense to adopt Jackson's motion. Rather, the only reasonable explanation is that trial counsel erred, and his justification was a *post hoc* justification for the failure. *Wiggins*, 539 U.S. at 526–27.

Likewise, Eler's testimony that the check was potentially helpful to the jury because it could be viewed as Mr. Wade's payment, which would "help the defense stay credible with the jury," also resembles a *post hoc* rationalization. Eler never showed the jury what "things" Mr. Wade was charged with getting rid of after the fact.

The Sumners' vehicle had been wiped clean and the shovels used during the crime were left in the trunk. Ultimately, the vehicle was ditched. The sum of $8,000 was obviously extravagant for wiping down and disposing of a car. Instead, any reasonable juror would infer that it was his share of the spoils for taking part in the full conspiracy. In fact, that is exactly what the State argued to Mr. Wade's jury:

> Again we have 8,000 reasons more to prove this case, 8,000 reasons that Reggie Sumner on his account was going to pay Alan Wade for his services, and the memo line on this is blank but we all know what it was for. That's what it was for, ladies and gentlemen. It was Michael Jackson's way of saying, hey, Alan, thanks for standing by that grave and shoveling dirt on those people. . . . You were right next to me when we shoveled that dirt and you earned this money. 8,000 reasons why we know he's guilty.

T. 1059-60.

Trial counsel's failure to object to the evidence from room 312 was unreasonable. The Florida Supreme Court's adjudication of this claim was an unreasonable application of and contrary to federal law and unreasonable determination of fact. This Court should conduct de novo review and grant relief.

**III. Trial counsel was ineffective in failing to object to the admission of the tape recording of the phone call in which Jackson and Cole pretended to be the victims**

At trial, the State played a tape recording of a phone conversation between Jackson and Cole and Detective Meacham. During the call, Jackson and Cole, pretending to be the victims, stated that they were in Delaware to attend a funeral and a neighbor had alerted them that their car had been stolen, and asked Meacham how to unfreeze the victims' bank accounts. Trial counsel did not object to the State's

presentation of irrelevant, non-confrontable hearsay evidence from two of Mr. Wade's non-testifying codefendants.

The Florida Supreme Court denied relief on this claim, finding that the recording was relevant to the prosecution of Wade "as a principal" and that the recording was not hearsay because "[t]he recording was not offered to prove the truth of its content—that the Sumners were alive and well in Delaware—but to establish that Jackson, Cole, and their accomplices were responsible for the murders." *Wade*, 156 So. 3d at 1017. (citation omitted). Additionally, the Florida Supreme Court found that trial counsel's decision to not object was "a reasonable, strategic decision." *Id.* The court's adjudication of this claim was an unreasonable application of and contrary to federal law and unreasonable determination of fact.

First, in finding the recording relevant and admissible as co-conspirator statements in furtherance of the conspiracy the Florida Supreme Court bootstrapped the State's argument was that Mr. Wade was a principal with the argument that Jackson and Cole's actions—in this instance lying to police and seeking to access the victims' bank accounts—should be counted against Mr. Wade. *Wade*, 156 So. 3d at 1017 ("[S]o long as the State offered evidence to establish that Wade aided Jackson and Cole—which it did, for example, through Nixon's testimony—evidence of the actions of Jackson and Cole was relevant to the prosecution of Wade. The recording thus was relevant because it was probative of Jackson and Cole being responsible for the Sumners' disappearance and the group's effort to access the Sumners' bank accounts."). But this bootstrapping was unreasonable. Under Florida law, the

52

conspiracy ordinarily ends when the crime ends. *See Brooks v. State*, 787 So.2d 765, 779 (Fla. 2001). The State had no evidence that Mr. Wade participated in, was present for, or even knew about the phone call which occurred days after the murder. Even under the State's theory, Nixon himself exited the conspiracy before this call was made and thus could not tie Mr. Wade to the call.

Second, in finding that recording was not hearsay the Florida Supreme Court found that "the recording was not offered to prove the truth of its content—that the Sumners were alive and well in Delaware—but to establish that Jackson, Cole, and their accomplices were responsible for the murders." *Wade*, 156 So. 3d at 1017. But earlier in the opinion, in finding the recording relevant the court recognized that the recording was played for the truth of the their statements—"the recording thus was relevant because it was probative of . . . the group's effort to access the Sumners' bank accounts." *Id*. Categorizing the recording as relevant specifically because they inquired about accessing the bank accounts but non-hearsay because they pretended to be the victims while doing so was unreasonable.

Regarding trial counsel's "reasonable, strategic decision" not to object to the recording, the Florida Supreme Court's finding was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts. Although Eler claimed that his failure to object was a strategic decision, Eler testified that he could not remember if he conducted any research into the admissibility of the recording. PCR. 1684. Although strategic choices made after thorough research are given substantial deference, "strategic choices made after less than complete

53

investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521. Trial counsel necessarily could not make a reasonable or strategic decision without having done the necessary investigation into the relevant law. *Hinton*, 571 U.S. at 274. Therefore, the Florida Supreme Court's categorization of this failure as reasonable and strategic was unreasonable.

The recording was inadmissible hearsay from Mr. Wade's non-testifying codefendants and reasonable counsel would have objected to the State playing it before the jury. The Florida Supreme Court's adjudication of this claim was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts, and this Court should conduct de novo review and grant Mr. Wade relief.

## IV. Trial counsel was ineffective for failing to object to the admission of a series of photographs of Jackson taken from ATM surveillance cameras

The State introduced a series of photographs showing Jackson using the victims' bank card at multiple ATMs. No other codefendant was visible in the photos, nor did the State establish Mr. Wade's participation or knowledge of the use of the ATMs. In closing, the State referenced Jackson using the ATMs to clean out the victims' bank accounts and that Mr. Wade's had knowledge and complicity in these matters. *See*, *e.g.*, T. 1042. Trial counsel failed to object to the introduction of the photos and the State's closing argument on this point.

The Florida Supreme Court denied relief, finding that "[t]he photographs were probative of the fact that the group somehow—presumably by force or by searching the Sumners' home—acquired the Sumners' personal identification numbers (PINs) and withdrew money from the Sumners' bank account." *Wade*, 156 So. 3d at 1020. Regarding whether the photographs would mislead the jury, the court noted that "the State never argued that Wade was the person in the photographs." *Id.*

In denying relief, the Florida Supreme Court unreasonably overlooked the fact that the State never proved Mr. Wade was present during any of these transactions nor did they prove his knowledge of these events. While this evidence was relevant to show the actions of codefendant Jackson, absent some testimony or evidence linking Mr. Wade to this activity, it was not relevant to show the culpability of Mr. Wade. Moreover, given that under the State's theory, Nixon had already exited the conspiracy by the time the photos were taken, the State had no evidence establishing that the conspiracy had extended beyond the night of the crime. *Brooks*, 787 So. 2d at 779 (finding codefendant's post-crime statements inadmissible against defendant because "Florida courts have consistently held that . . . a conspiracy ordinarily ends when the crime has been committed.").

The Florida Supreme Court also found that trial counsel "made a reasonable, strategic decision not to object to the photographs." *Id.* "Eler did not object to the ATM photographs because he concluded that 'as long as Michael Jackson's picture is plastered up there in front of the jury and Alan Wade's picture wasn't[,] that was better.'" *Id.* (alteration in original). The court's decision was an unreasonable

application of and contrary to clearly established law and an unreasonable determination of facts. Eler's testimony on this point was a weak attempt at a *post hoc* justification. *Wiggins*, 539 U.S. at 526–27. The court unreasonably overlooked Eler's concession that the photographs allowed the State to argue "that Alan Wade was part of this hitting of the ATM machines and the receiving of the money from the ATM machines." PCR. 1691. The ATM photos did nothing to increase the culpability of Jackson while allowing the State to effectively put Mr. Wade in the photos. T. 1059 ("You can take Alan Wade's face and cut it out and you can stick it everywhere you see Michael Jackson's face[.]").

The Florida Supreme Court's adjudication of this claim was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts. Trial counsel's failure to object to the photographs was unreasonable and this Court should grant relief.

## V. Trial counsel was ineffective for failing to object to the State improperly calling Mr. Wade's mother as a witness to be impeached and provide bad character evidence

The State called Mr. Wade's mother as a witness for two purposes: (1) so that she could be impeached with a statement she previously made to a detective that Mr. Wade told her that Jackson promised to pay him $40,000 in exchange for his help in this crime and (2) to testify regarding Mr. Wade's bad character, which included his drug use, school truancy, and the fact that he had been kicked out of the house by his mother. Trial counsel failed to object despite both purposes being inadmissible.

The Florida Supreme Court denied relief, finding that "defense counsel cannot be deemed deficient for failing to make a meritless objection." *Wade*, 156 So. 3d at 1020 (quotation omitted). Regarding the bad character evidence, the court found that it was not introduced "to prove that Wade had a propensity to commit crimes." *Id.* at 1021. Instead, "Ganey related details of Wade's life in order to establish his relationship with Jackson and to show that Wade needed money around the time of the crimes." *Id.* And "Ganey's testimony about Wade's truancy and drug use was also relevant to establishing that despite having only recently turned eighteen years old, Wade was not living with his mother on July 8, 2005, the night the group robbed, kidnapped, and murdered the Sumners." *Id.* As to the impeachment, the court found that "while the State likely hoped to introduce the statement about $40,000, the record demonstrates that Ganey was not called primarily for that purpose." *Id.* at 1022.

The Florida Supreme Court's opinion on both counts was unreasonable. Regarding the bad character evidence, the court's findings—that Ganey's testimony was relevant to establish Mr. Wade's relationship with Jackson and his need for money and that he was not living with his mother on the night of the crime—were unreasonable. On the first point, the court was unreasonable because Ganey's testimony was not necessary or relevant to establishing those facts at all given that Nixon had already established them through his testimony. On the second point, the court was patently unreasonable. Where Mr. Wade was living at the time of the crime wholly lacked any relevance and was not a contested question at trial. Therefore, the Florida Supreme Court's findings on this point were based on unreasonable

57

determinations of fact. Moreover, even to the extent that this testimony may have "established" those facts and thus held some relevance, the Florida Supreme Court unreasonably failed to consider the undue prejudice of Ganey's testimony. *See Michelson v. United States*, 335 U.S. 469, 475-76 (1948) (noting that the "overriding policy of excluding [bad character] evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.").

As to the impeachment, Ganey was asked whether she made the $40,000 comment during a conversation with Detective Gupton and testified that she could not remember the substance of her conversation and that Mr. Wade never told her about the promise of money. T. 511-12. This was entirely consistent with her deposition testimony during which she said she could not recall the conversation. PCR. 1693. Detective Gupton was called to the stand as the State's next witness. He was asked about nothing other than the conversation with Ganey and, without objection, the State played a 9-second clip of the recording of the conversation to the jury. T. 518-19. The recording showed Ganey telling Detective Gupton "I will tell you this because Bruce and Alan have both told me this, that Mike [Jackson] promised them each $40,000 to help him." *Id*.

This was inadmissible under Florida law. Impeachment is improper when "a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible." *Morton v. State*, 689 So. 2d 259, 264 (Fla. 1997), *receded from on other grounds, Rodriquez v. State*, 753 So.2d 29 (Fla. 2000).

58

Although the Florida Supreme Court recognized that the State had "hoped" to be able to impeach Ganey, the court denied relief on this claim based on the finding that it was not a "primary" purpose of calling her as a witness. *Wade*, 156 So. 3d at 1021-22.

This finding was unreasonable. The State had two reasons for calling her: bad character and impeachment. It was unreasonable not to recognize the obvious: the impeachment was a primary purpose for calling her. The State knew exactly what her trial testimony would be given that she had already testified to it in a pretrial deposition. To the extent that court found the State's bad-character purpose cancels out the impeachment purpose under *Morton*, this was based on two unreasonable findings. First, the bad character testimony was itself inadmissible under Florida law and one impermissible purpose cannot render another inadmissible purpose admissible. Calling a witness for multiple improper purposes is strong evidence of bad faith. Second, to allow the inadmissible impeachment because trial counsel also unreasonably failed to object to the bad character evidence unreasonably penalizes Mr. Wade for receiving ineffective assistance of counsel.

To the extent that the Florida Supreme Court deemed trial counsel's failure to object as strategic, the court's failure to consider trial counsel's testimony that he had not researched whether the impeachment was improper was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521. This includes the failure to

59

conduct a reasonable investigation of the relevant state law. *Hinton*, 571 U.S. at 274. Because Eler failed to conduct such an investigation, PCR. 1693-94, it was a violation of § 2254(d) to find that his failure was strategic.

Trial counsel failed to object when the State called Mr. Wade's own mother to provide damning bad character evidence against Mr. Wade and to be impeached. The Florida Supreme Court's adjudication of this claim was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts, and this Court should conduct de novo review and grant Mr. Wade relief.

## VI.    Trial counsel was ineffective for failing to object to improper hearsay and opinion testimony

At trial, the State was able to present substantial portions of its case through improper hearsay and opinion testimony. Trial counsel was ineffective for failing to object to this improper testimony.

### a.  Hearsay linking Mr. Wade to the conspiracy

The State connected Mr. Wade to the conspiracy through two pieces of key hearsay evidence. First, the State presented a receipt from the Comfort Inn in Jacksonville Beach, Florida for July 12, 2005, which indicated that Cole paid for the room and that she, Jackson, and Mr. Wade were the registering guests. Second, Cole's brother stated to law enforcement that Cole had told him that she had just come back from Florida with a couple of guys. Although the Florida Supreme Court found on appeal that both were hearsay and that the second statement did not even clear the relevance threshold, the Florida Supreme Court denied relief. *Wade*, 156 So. 3d at

1022. The court found that Eler "made a reasonable, strategic decision not to object" because the evidence, while inadmissible, "was not inconsistent with Wade's defense" to being an accessory after the fact. *Id*.

The Florida Supreme Court's findings were unreasonable. The hearsay evidence tied Mr. Wade to Cole and Jackson together while they were in the State of Florida. The hotel receipt did nothing to minimize Wade's involvement in the crime. Instead, in the eyes of a reasonable juror, it showed that the three codefendants were as culpable as one another because they were all staying together in a hotel in the aftermath of the crime in Jacksonville. Moreover, reasonable jurors would obviously question why Mr. Wade was staying with them instead of the apartment he had in Jacksonville. Likewise, the statement from Cole's brother linked Mr. Wade to the other codefendants during their time in Florida. Mr. Wade gained nothing by being linked to the conspiracy before the party traveled to South Carolina. As Eler testified, "the timeline is important to me in objecting. In other words, if it was before the incident they were friends. They were partying. That may not be as significant to me." PCR. 1706. Failing to object was inconsistent with Eler's own strategy and finding otherwise was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts

Trial counsel's failure to object was based on a fundamental misunderstanding of law. The hearsay statements in this subclaim were presented through detective Meacham and Officer Rowan. Eler testified in postconviction that, within limits, the lead detective can "get up and lay out the case for the state." PCR. 1697. "They

summarize interviews, things of that nature" PCR. 1697-98. He did not believe he could object to this evidence even though he admitted that certain of this evidence hurt Mr. Wade. PCR. 1698. But this kind of testimony is, in fact, inadmissible on both relevancy and hearsay grounds. *See Keen v. State*, 775 So.2d 263, 274 (Fla. 2000) (noting that this kind of law enforcement testimony is not relevant and "classic hearsay"). Because Eler's failure was based on an unreasonable misunderstanding of law, it was deficient. *Hinton*, 571 U.S. at 274. Therefore, this Court should review the subclaim de novo and grant relief.

### b. Detective Meacham's improper testimony

Through Detective Meacham, the State was able to get in front of the jury inadmissible testimony regarding the duct tape ostensibly used to commit the crime and of Meacham improperly identifying Mr. Wade in security camera photographs and video footage. Regarding the duct tape, Meacham provided improper hearsay testimony regarding fracture-match testing of the tape found at the gravesite and improper opinion testimony that the duct tape was the same as the tape purchased by Cole at Office Depot. The Florida Supreme Court found that the fracture-match testing testimony was hearsay, but that Meacham's opinion testimony that the tape was the same type was permissible lay opinion testimony. *Wade*, 156 So. 3d at 1023-24. As to the camera footage and photos, Meacham was allowed to identify Mr. Wade as being present at the Walmart with Cole and Jackson on July 7 and 9, and at a gas station in Georgia with the co-defendants on July 12. The jury was never shown the gas station footage. The court found that while the identifications were improper, Eler had a

strategic reason not to object to the July 9 Walmart identification and the gas station identification. *Id.* at 1023.

This Court is free to review the deficiency prong de novo of the subclaims that the Florida Supreme Court did not address, including the fracture-match duct tape testing hearsay and the July 7 Walmart identification. Trial counsel was deficient in failing to object to the testimony. As the Florida Supreme Court recognized, testimony on both of these points was inadmissible. *Wade*, 156 So. 3d at 1023. The July 7 Walmart identification was particularly damning and contrary to trial counsel's strategy of arguing that Mr. Wade was an accessory after the fact given that it put him together with Jackson and Cole preparing for the crimes before they were committed. The failure to object to the identification testimony and the fracture-match hearsay was unreasonable.

As to the subclaims for which the court did address deficient performance, the court's findings were unreasonable. Regarding the duct tape, Detective Meacham's opinion testimony was clearly improper. Contrary to the court's interpretation, in context he was asked to express an opinion, or at least create the inference, that the duct tape found at the gravesite was from the roll that Cole purchased at Office Depot. The State first asked Detective Meacham about two items on a receipt from Office Depot—Saran Wrap and a roll of duct tape—before asking him if he was familiar with the duct tape found on the gravesite. T. 841. The State then asked if the duct tape found at the gravesite was the same, or at least the same type of, duct tape that was purchased at Office Depot. T. 841-42. Finally, the State asked Detective Meacham about any

testing conducted by FDLE on the torn pieces of the Office Depot duct tape, which Detective Meacham testified the testing was inconclusive. T. 844. It is clear in context that the State wanted the jury to infer that the duct tape was one in the same, rather than merely being the same type.

The Florida Supreme Court was unreasonable in finding that trial counsel had a reasonable strategic justification for failing to object to the July 9 Walmart identification and the gas station identification. First, as to the gas station identification, the jury was not even shown any video or photographs of the codefendants at the gas station. Instead, jurors were simply asked to take Detective Meacham's word for it that Mr. Wade was there with Jackson and Cole. In denying both subclaims, the court reasoned that Eler's failure to object was reasonably strategic because "the majority of the evidence challenged by Wade was consistent with the defense's strategy of arguing that Wade was an accessory after the robberies, kidnappings, and murders, not a participant in those crimes." *Id.* The court's decision was based on unreasonable application of and contrary to clearly established law and an unreasonable determination of facts. Eler's strategy was to allow the admission of evidence showing "that Michael Jackson and Tiffany Cole are more involved than [Wade]." PCR. 1708. The identifications of Mr. Wade at Walmart and the gas station tie the codefendants together and equally involved, not that that Jackson and Cole were more involved. Allowing the improper testimony in without objection was counter to trial counsel's strategy and therefore unreasonable performance.

The Florida Supreme Court's adjudication was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts, and this Court should review the subclaim de novo and grant relief. And to the extent that the court denied certain subclaims only on prejudice grounds, this Court can review the deficient performance of those subclaims de novo and grant relief. As noted above, trial counsel's failure to object to the improper hearsay evidence presented through law enforcement witnesses was quintessential deficient performance because it was based on a misunderstanding of law.

### c. Officer Rowan's improper opinion testimony regarding the car keys

At trial, without objection, Officer Rowan was allowed to testify that the car keys found in room 302 belonged to the Sumners. The Florida Supreme Court denied relief on this claim finding that when "asked to describe 'any property [found in room 302] that appeared to be relevant from the information you had to the abduction of Reggie and Carol Sumner,' Officer Rowan explained why he suspected that the keys were for the Sumners' Lincoln." *Wade*, 156 So. 3d at 1024 (alteration in original). The court reasoned that although Officer Rowan explained his suspicion that the keys belonged to the Sumners, "he did not actually opine that they were. Officer Rowan presented facts to the jury and allowed the jurors to reach their own conclusion." *Id*.

This was unreasonable. Officer Rowan functionally gave the jury his opinion that the keys belonged to the Sumners. Officer Rowan testified the keys belonged to a Lincoln—the same brand of vehicle the Sumners owned and that was missing. T. 631. The keys also had an Air Force insignia—Reggie Sumner was a veteran of the Air

Force. T. 631. Lastly, the hotel was not very populated and there were no Lincolns in the parking lot. T. 631. The only thing missing in that testimony were the magic words 'it is my opinion that these car keys belonged to the Sumners.' This Court should review the claim de novo. As noted above, trial counsel's failure to object to the improper hearsay evidence presented through law enforcement witnesses was quintessential deficient performance because it was based on a misunderstanding of law. This Court should grant relief.

### d. U.S. Marshal Alred's improper expert testimony

The State was able to present testimony regarding cellphone data and cellphone tower technology through U.S. Marshal Alred despite the fact that he was not qualified as an expert. Trial counsel did not object. The Florida Supreme Court denied relief, finding that trial counsel would not have a basis to object to Marshal Alred's testimony because "non-experts may testify about cell phone records." *Wade*, 156 So. 3d at 1024-25. The court's resolution of this claim was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts.

Marshal Alred clearly improperly provided expert testimony. From the beginning of his examination, Marshal Alred portrayed himself and his agency as having specialized knowledge on cellphones—knowledge that a regular person would not have access to:

> The Marshal Service is one of the lead agencies who through its training and experience exploit technical information and -- that pertains to cellular telephones. We probably do it better than anybody. We have special people that do nothing but that and we use that technology to locate a cell phone or a person using a particular cell phone.

T. 591. Ostensibly the testimony he provided to the jury was based on his unique expertise as a U.S. Marshal, but he even went as far as to get into the minutiae regarding how cell phones and cell towers work. T. 597-606; *cf. United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (noting that Federal Rule of Evidence 701—which controls over the admissibility of lay testimony—was amended in 2000 to explicitly incorporate the requirement that a lay witness "may only testify to opinions or inferences . . . not based on scientific, technical, or other specialized knowledge" because of the concern of "proffering an expert in lay witness clothing").

The State repeatedly bolstered his testimony as an expert. For instance, the State asked him: "Now in the course of your experience, do you know if David Jackson is an accurate name?" T. 593. He responded that "[t]his particular phone that is owned by Nextel is what's called a Boost phone. A Boost phone is a temporary or commonly called a throwaway phone." T. 593. Further highlighting that the State was eliciting testimony from him that a person would not possess, the State asked him: "And then the next portion of the column is kind of a little bit more convoluted. Could you explain to the jury what that is?" T. 595. The State continued its reliance on his expertise by asking him: "Now, Inspector, were you able to prepare some diagrams that will help the jury understand how cell towers are able to record where people are when they actually make phone calls?" T. 596; *see also* T. 597 ("Explain for the jury -- we might have missed this. Explain for the jury how a cell phone works and how it uses a tower to make a call.").

In denying this subclaim, the Florida Supreme Court unreasonably relied upon its prior precedent *Gordon v. State*, 863 So. 2d 1215, 1219 (Fla. 2003). *Wade*, 156 So. 3d at 1025 (citing *Gordon* for the proposition that "[t]his Court has held that non-experts may testify about cell phone records."). In *Gordon*, the prosecution presented the testimony of a cellular company employee and a detective who "compared the locations on the phone records to locations on the cell site maps." *Gordon*, 863 So. 2d at 1219. There the court held that while the detective did not engage in improper expert testimony, the cell phone employee essentially did but "if challenged, her record qualifications demonstrate that she would have been qualified as an expert on the matters she addressed." *Id*. Here, Marshal Alred played both of the roles present in *Gordon*—the cellular company employee and the detective.

This Court is free to review the claim de novo. Trial counsel's performance was deficient because a non-expert was allowed to provide extensive and in-depth improper expert testimony without objection. This Court should grant relief.

## VII.    This Court should presume prejudice

As an initial matter, this Court should presume prejudice because, as noted above, trial counsel's investigator had an actual conflict of interest. Hurst, the guilt-phase investigator, was working for both Mr. Wade and Cole. In fact, billing records show that on at least one occasion he billed for 22 hours between both cases on the same day. *Compare* App. C, at A178 with App. D, at A188. This was a clear conflict of interest, given that the main trial defense of both codefendants was to minimize

their own role at the expense of the other codefendants. *Boykin*, 541 F.3d at 647. Because Hurst was employed by Eler in this case, the conflict is imputed to Eler. *Reynolds*, 253 F.3d at 1343. The clear reasonable alternative strategy would have been to utilize an investigator without a conflict. Therefore, because there was a clear possibility that the interests of one of the codefendants could be "sacrificed for the benefit of the other," this "blossomed into an actual conflict" under *Cuyler*, and this Court should presume prejudice. *Reynolds*, 253 F.3d at 13.

## VIII.  Mr. Wade was prejudiced by these failures individually and cumulatively

Even if this Court does not presume prejudice, Mr. Wade was prejudiced by Eler's deficient performance. The right to effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). Because of Eler's almost complete failure to challenge the State's case through pretrial motions to suppress or objections at trial, the State's case against Mr. Wade was never truly subjected to "the crucible of meaningful adversarial testing." *Id*. Had it been, there is a reasonable probability that the result of the proceedings would have been different.

To the extent that the Florida Supreme Court did not address prejudice on any subclaim, this Court is free to review it de novo. *Rompilla*, 545 U.S. at 390. To the extent the court did, the court's adjudication was an unreasonable application of law or fact and contrary to clearly established law and will be addressed in this section. This Court should consider the prejudice of trial counsel's deficiencies cumulatively.

*Strickland*, 466 U.S. at 695-96 ("[T]aking due account of the effect of the errors . . . a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."); *cf. Kyles v. Whitley*, 514 U.S. 419 (1995). But even individually, there is a reasonable probability of a different result but for trial counsel's deficient performance.

The Florida Supreme Court only addressed the prejudice of two subclaims: (1) Detective Meacham's fracture-match tape testing testimony and (2) identification of Mr. Wade in the July 7 Walmart photographs. *Wade*, 156 So. 3d at 1023. The court's adjudication of both was an unreasonable application of and contrary to clearly established law and an unreasonable determination of facts. In denying the fracture-match subclaim, the court unreasonably focused on the fact that Meacham told the jury the testing was inconclusive without noting the context of that statement. But as noted above, from context, the clear inference the State wanted to build in the mind of jurors was that the duct tape found at the burial site was the same tape that Cole purchased at Office Depot. In denying the July 7 Walmart identification subclaim, the Florida Supreme Court unreasonably diminished the import and undue credibility that jurors would have placed on a law enforcement officer identifying Mr. Wade. Moreover, by analyzing the prejudice of these subclaims in a vacuum without conducting a cumulative review was an unreasonable application of and contrary to clearly established federal law. *Strickland*, 466 U.S. at 695-96; *Kyles*, 514 U.S. at 436 (noting that prejudice under *United States v. Bagley*, 473 U.S. 667, 682 (1985), which adopted *Strickland* prejudice, requires cumulative review).

70

This Court should look at the cumulative prejudice of Eler's failures. Outside of the evidence trial counsel failed to object to, there was minimal physical or forensic evidence tying Mr. Wade to the crime—namely his fingerprint being found on a magazine addressed to the victims found in a common area of Mazda rented by Cole. The State was instead allowed to build its case through inadmissible testimony and the exceedingly dubious credibility of Bruce Nixon. Had trial counsel subjected the State's case to true adversarial testing, the State's case could not have survived without the evidence found in the hotel rooms, the phone recording of Jackson and Cole, the photos of Jackson using ATMs, the improper identifications of Mr. Wade, the improper opinion and expert testimony, the hearsay tying Mr. Wade to the conspiracy in the state of Florida, and the improper impeachment and bad character evidence brought out through Mr. Wade's mother. Notably, this evidence constituted large portions of the State's closing argument during the guilt phase. Therefore, but for trial counsel's unreasonable performance there is a reasonable probability of a different result, and this Court should grant relief.

**Claim 3:**    **The State presented and/or failed to correct the false testimony of Bruce Nixon**

*"Bruce Nixon told you everything you need to know about this case, and you can believe Bruce Nixon because why would he lie? Why would Bruce Nixon lie?"*[18]

Bruce Nixon lied. At Mr. Wade's 2022 resentencing, Nixon attempted to set the record straight about his false testimony at Mr. Wade's original trial, but the trial court

---

[18]    Guilt phase closing argument of ASA Mizrahi. T. 1060.

71

sealed his lips before he could fully explain how and why he lied. As Nixon has now admitted, at Mr. Wade's trial he simply said what he was told to say. Because Nixon was high on Xanax and methadone, he was "in and out of consciousness" during the crime and lacked a substantial memory. RS. 202. As a result, his testimony was "guided" by his trial attorney who "filled in the blanks for me and told me what to say." *Id*. Mr. Wade was convicted based on this false testimony.

The State violates the Fourteenth Amendment when it presents false or misleading evidence. *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959). "*Giglio* error, a species of *Brady* error, occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." *United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017). Implied misrepresentations, even if "technically correct," constitute a due process violation. *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957). Even if the State does not solicit false testimony, the State cannot "allow[] it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. Materiality is established if there is "any reasonable likelihood" the jury's verdict was affected. *Stein*, 846 F.3d at 1147. Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the petitioner must show that the constitutional violation "had substantial and injurious effect or influence in determining the jury's verdict."

It is a violation if the prosecutor knew or should have known the testimony was false or misleading. *United States v. Agurs*, 427 U.S. 97, 103 (1976). *Giglio* violations can arise from the "negligence or design" of any state officer who had actual or

constructive knowledge of the falsity. *Giglio*, 405 U.S. at 154; *see also Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1349 (11th Cir. 2012). Whether State officials acted in bad faith or believed they were acting appropriately is irrelevant: *Giglio* violations occur "because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U.S. at 110.

As an initial matter, Nixon has now admitted that his testimony against Mr. Wade was false both substantively and given that potential avenues of impeachment were suppressed. At the very least, it was exceedingly misleading given that Nixon had little to no memory of the events and had the blanks filled in form him so he would know what to say to best suit the State's case. RS. 202, 206, 207-09. Mr. Wade's jury was not made aware that Nixon was using Xanax and methadone so extensively at the time of the crime that he lacked a credible memory of the crime.[19] Notably, contemporaneously with the crime, Nixon bragged to friends in the singular voice that "he killed" someone and that "he buried" someone alive, T. 1000, 1003, directly contradicting the trial testimony that he has now admitted was "guided" to fit the State's case, RS. 202. In fact, Nixon's keg party confession was markedly different from his trial testimony in which he claimed to not even know what happened at the burial site because he walked away and did not participate. T. 911-12 ("Q. Do you know what happened at that grave site when you weren't there? A. No, sir.").

---

[19]    Although the jury learned that Nixon smoked marijuana and drank alcohol before the crime, T. 943-44, the jury was not aware of the full drug use and or the extent of the impact the drug use had on his memory to the point that someone had to tell him what his testimony would be, *cf. Alcorta,* 355 U.S. at 31 (misrepresentation by state witness violates due process).

The State knew, or should have known, that Nixon's testimony was false. As an initial matter, knowledge—actual or constructive—is established by the fact that the cases against Mr. Wade and Nixon were both prosecuted by ASA Mizrahi, who has presumed knowledge of the prosecutorial files in each case. *Agurs*, 427 U.S. at 109. In this case Nixon had a strong motive to lie: instead of facing the death penalty, he received a term of 45 years based on his testimony against his codefendants. And even if Mizrahi did not actively elicit Nixon to testify falsely, he had an obligation to recognize the falsity and correct it when it occurred. However, "given the importance of [Nixon's] testimony to the case," the State "may have consciously avoided recognizing the obvious—that is, that [Nixon] was not telling the truth." *United States v. Wallach,* 935 F.2d 445, 457 (2d Cir. 1991).

Corroboration that Nixon's trial testimony was false comes from his pre-trial actions. After he was arrested, Nixon gave multiple conflicting statements ranging from Nixon being entirely innocence to Mr. Wade not being involved. It was only after law enforcement dangled the possibility of a deal in front of him and told him that other codefendants made statements implicating him did Nixon begin telling the story that the State eventually used at Mr. Wade's trial. *Cf. Wearry v. Cain*, 577 U.S. 385, 136 S. Ct. 1002, 1007 (2016) ("[E]ven though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material because the jury might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor") (internal quotation omitted).

Further corroboration comes from Nixon's post-trial actions. Nixon's resentencing admission follows two previous materially similar admissions that his trial testimony was false. On July 28, 2008, nearly a year after Mr. Wade's trial, Nixon wrote to Mr. Wade's mother that he regretted going along "with what the State told [him] to do." App. G, at A210-A211. Nixon mentioned the benefits he believed he would receive from the State, before admitting his trial testimony was false:

> He told me to sound guilty as possible when I told him I was on shrooms and pills and smokin weed he told me what to say and how to say it. That's why I sounded like a robot. I'm sorry I lied at trial I just did what my PD told me to do I don't remember what happened I remember a little bit cause I was blacked out. I don't know if I could but I want to take it to trial I know I gave my life to the State and they manipulated me[.]

*Id*. at A211.

During postconviction, in an interview with postconviction investigator Bolin, Nixon again confirmed that his trial testimony was false. He confirmed that the State told him what to say, that he rehearsed his answers with the State, and that there were answers to questions at Mr. Wade's trial he gave using words that Nixon himself would have never used. Despite this admission, postconviction counsel did not raise a claim or present the facts of his false testimony in the amended postconviction motion that was filed the *next* day. PCR. 385. Despite calling Nixon as a witness during the postconviction evidentiary hearing, collateral counsel only asked him questions regarding the potential mitigation testimony Nixon could have provided during the penalty phase of Mr. Wade's trial.

Apart from Nixon's admission that his testimony was substantively false, his testimony also provided the jury with the false impression that Nixon had no problem recalling the crime and that he had only smoked some pot before the crime. But Nixon has now admitted that was false in light of his heavy drug use. RS. 202. ("And a lot of things I didn't -- I was on Xanax and methadone at the time so in and out of consciousness you feel what I am saying? So he filled in the blanks for me and told me what to say."). This is classic impeachment evidence that was improperly withheld from the defense and the State failed to correct Nixon's testimony on this point. *See Browning v. Trammell*, 717 F.3d 1092, 1105 (10th Cir. 2013) (noting that evidence showing "memory deficits" is "classic impeachment evidence"). "A witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired. Consequently, the witness's capacity at the time of the event, as well as at the time of trial, is significant." *Id*.; *see also Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (suppressed evidence regarding witness's memory problems "could have been used to demonstrate [witness's] impaired ability to perceive, remember and narrate perceptions accurately, which is clearly relevant to his credibility as a witness.").

Rather than investigating or correcting Nixon's testimony, the State capitalized on it at trial, aggravating the *Giglio* error. *DeMarco v. United States*, 928 F.2d 1074, 1075-77 (11th Cir. 1991) ("[T]he prosecutor's argument to the jury capitalizing on the perjured testimony reinforced the deception of the use of false testimony and thereby contributed to the deprivation of due process."). The State relied extensively on

76

Nixon's testimony in closing argument. T. 1035-38, 1042-43, 1055, 1057, 1060-62. The State essentially had no choice but to, given how little other evidence there was tying Mr. Wade to the crime itself. The State relied upon Nixon's testimony and asked the jury to infer from Jackson's cellphone data that others were with him in the same location. T. 1038; *see also* T. 1059 ("You can take Alan Wade's face and cut it out and you can stick it everywhere you see Michael Jackson's face[.]"). As the State repeatedly conceded during closing, the physical evidence—*e.g.* the victims' car key and the fingerprint on the magazine—could not be dated and only indicated that Mr. Wade had at least some level of involvement, which was Mr. Wade's defense. T. 1056-57. Ultimately, ASA Mizrahi summed up Nixon's importance to the State: "Bruce Nixon told you everything you need to know about this case, and you can believe Bruce Nixon because why would he lie? Why would Bruce Nixon Lie." R. 1060.

During the State's closing, the State vouched for Nixon's false testimony by rhetorically asking questions such as if Nixon was lying, "how could he possibly get" law enforcement "to go along with what his evidence said" and "why wouldn't he exaggerate" to aggravate Mr. Wade's role. T. 1061-62. The State bootstrapped the fact that the facts fit Nixon's story to argue that he must have been truthful—"It's not magic. It's not luck. It's not coincidence. It's corroboration. It's facts telling you that he's being truthful." T. 1104. Additionally, the State argued that Nixon was too dumb to lie: "There's no way Bruce Nixon is that bright. There's no way Bruce Nixon would come up with the story that he told and have everything else corroborate that. . . . There's no way Bruce Nixon was smart enough to get away with making all of this

stuff up[.]" T. 1062, 1064. But now the truth has come out: Nixon did not have to "come up with the story;" he was told how to testify and the blanks were filled in for him. The State was able to bootstrap the fact that Nixon's testimony was molded to fit the facts to argue that Nixon was credible precisely because his story fit the facts.

The false testimony was material.[20] Nixon's testimony was critical for the State's case. His testimony was the only evidence establishing Mr. Wade's involvement of the crime beyond being an accessory after the fact. The evidence collected by the state— *i.e.* the victims' car key, Mr. Wade's fingerprint being on a magazine in a common area of the car where the co-defendants spent several days driving, and the check made out in Mr. Wade's name—are completely consistent with Mr. Wade's main defense at trial that he was recruited into the conspiracy after the crime was committed to aid Jackson and Cole in accessing and spending the money from the victims' bank accounts. And the materiality of the false testimony regarding the impact of drugs on Nixon's mental state is likewise clear given that the jury, who was allowed to ask questions of witnesses in this case, specifically asked Nixon to clarify whether he was under the influence during the crime. T. 943-44. Had Nixon answered truthfully, or had the State exercised their obligation to correct his false testimony, a reasonable juror very well could have discredited his testimony. Therefore, without Nixon's testimony,

---

[20]    Although Mr. Wade recognizes that under current Eleventh Circuit precedent, this Court is required to apply *Brecht* prejudice to *Giglio* claims, *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012), the Eleventh Circuit's application of *Brecht* to *Giglio* claims is the subject of a circuit split, *see Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 147-52 (3d Cir. 2017). Regardless, the error in this case was not harmless under any standard.

or, at least, now that his testimony would be completely incredible in the eyes of a reasonable juror, there is clearly reasonable doubt as to his convictions and the error was not harmless under *Brecht*.

## CONCLUSION AND RELIEF SOUGHT

The errors that occurred during Mr. Wade's trial and subsequent proceedings deprived him of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Each of the claims in this petition individually warrant relief. Even if the Court does not grant relief on any individual claim, it should consider the errors in the case cumulatively and grant relief. Considered individually and cumulatively, the federal constitutional errors in Mr. Wade's case had a prejudicial effect on the outcome.

Mr. Wade requests the leave to amend or supplement the petition be granted as may be appropriate; that Mr. Wade be given the opportunity to seek evidentiary and/or factual development in this Court, including discovery for a full and fair resolution of the claims in this petition and that this Court conduct an evidentiary hearing on all claims involving disputed issues of fact; that Respondent be ordered to respond to Mr. Wade's claims; that Mr. Wade be allowed to respond to any affirmative defenses raised by Respondent or sua sponte by the Court; and, ultimately, that the writ of habeas corpus be granted, and his convictions and sentences vacated and that he be allowed any other alternative relief as may be just, equitable, and proper under these circumstances.

Respectfully submitted,

/s/ Daniel S. Lawless
Daniel S. Lawless
Abdel Reyes
Office of the Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301-1300
(850) 942-8818
daniel_lawless@fd.org

*Counsel for Petitioner*